**In re QUICK CHARGE, Inc.**

No. 8303.

District Court, W. D. Oklahoma.

Jan. 27, 1947.

J. B. Dudley, of Dudley, Duvall & Dudley, of Oklahoma City, Okla., for debtor.

A. J. Moore, of Moore & Moore, of Oklahoma City, and David Previant, of Padway & Goldberg, of Milwaukee, Wis., for respondents.

VAUGHT, District Judge.

Quick Charge, Inc., is a corporation organized and existing under the laws of the State of Oklahoma, having its principal place of business in Oklahoma City, Oklahoma.

The following are named as respondents in this action: The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 886, (hereinafter referred to as Local No. 886) affiliated with the American Federation of Labor and an unincorporated labor union organization of Oklahoma City,

Oklahoma, James E. Hamilton, G. R. Stewart, C. A. Ward and S. A. Ambrister, president, vice president, secretary-treasurer and recording secretary, respectively, of said Local No. 886, R. L. Cranford and Maurice E. Mitchell, active, participating organizers of Local No. 886.

During the early part of March, 1946, organizing representatives of Local No. 886, including H. L. Cranford and Maurice E. Mitchell, visited certain of the employees of the debtor in an effort to have said union selected as the bargaining agent of the employees, and said Cranford and Mitchell also called upon the debtor and discussed with its president and managing officer, A. C. Fletcher, the advisability of Local No. 886 becoming the bargaining agent of the employees of the debtor, and represented to him that more than 51 per cent. of the then employees of the debtor had joined and were members of said union. Fletcher stated that he would willingly abide by the decision of a majority of his employees, and asked them to produce and furnish him reliable information supporting their contention that more than 51 per cent. of the then employees of the debtor were bona fide members of said union, which they declined to do. On this occasion, or shortly thereafter, they and other representatives of Local No. 886 presented to the debtor a proposed working agreement between the debtor and said union as the bargaining agent of the then employees of the debtor, and demanded the execution thereof. The debtor declined to execute such agreement.

On March 23, 1946, the debtor entered into a written stipulation with Local No. 886 by the terms of which the debtor agreed that the National Labor Relations Board should conduct a consent election for the purpose of determining the bargaining agent, if any, of the then employees of the debtor. On April 9, 1946, pursuant to said stipulation, the election was had at the plant of the debtor, as required by law, under the direction and supervision of a representative of the National Labor Relations Board.

Prior to the election aforesaid, the International Union United Aircraft, Agricultural Implement Workers of America, Local No. 5, (hereinafter referred to as Local No. 5) became interested in being selected as the representative of the then employees of the debtor, and by agreement of all parties, under the direction of Edwin A. Elliott, Regional Director of the Department of Labor, its name went upon the ballot along with Local No. 886.

The day prior to the election, a representative of Local No. 886, in a conversation with the attorney for the debtor, complained about the name of Local No. 5 being placed on the ballot, and insisted that the debtor put a notice on the bulletin board of its manufacturing plant to the effect that the company had *no objection to its employees voting for said Local No. 886.* The request was denied and in connection therewith, the attorney for the debtor advised said representative that to comply with his request would be a violation of law and would be prejudicial to Local No. 5. Whereupon said representative of Local No. 886 stated that the only way the debtor could avoid picketing was to recognize Local No. 886 as the bargaining agent and to unionize the plant.

Prior to the holding of said election, it was agreed between all parties interested that of the then employees of the debtor, approximately 63 were eligible voters. The result of the election was as follows: For Local No. 886, 21 votes; for Local No. 5, none; against participating labor organizations, 41 votes. Following the election, a certificate was issued by the National Labor Relations Board and was signed for Quick Charge, Inc., by Paul W. McMahan, Sr.; for the Regional Director, Sixteenth Region, by John F. White; for Local No. 886, by Isaac C. Perry; and for Local No. 5, by W. C. Preston, which certified "that such balloting was fairly conducted, that all eligible voters were given an opportunity to vote their ballots in secret, and that the ballot box was protected in the interest of a fair and secret vote."

A day or two after the election, three representatives of Local No. 886, two of whom were Cranford and Mitchell, called upon the attorney for the debtor and during the conference stated in effect that the only way the debtor could avoid having its plant picketed, would be for it to sign

the agreement recognizing Local No. 886 as the bargaining agent of its employees. No proposed agreement was presented on that occasion but on April 30, 1946, the attorney of Local No. 886 wrote a letter to the debtor's attorney, enclosing a proposed contract which was in effect a closed shop contract. The debtor refused to execute said proposed contract on the grounds that to do so would be bargaining with a minority of the employees and in violation of law, and on or about May 13, 1946, Local No. 886 began to picket the debtor's place of business, has continued so to do, and was doing so at the time of this trial.

Under the evidence, there had been no dispute of any character as to wages, hours, or working conditions between the debtor and its employees, and the only so-called labor dispute as shown by the evidence was that the majority of the employees refused to select Local No. 886 as their bargaining agent. This, counsel of respondents urges as *the* labor dispute under the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.

At the time the picket line was placed about the debtor's property, a conference was had in the office of the debtor's attorney in which the representative of Local No. 886 asserted that undue influence had been exercised by the officers of Quick Charge, Inc., with the employees against Local No. 886. The representative of the Labor Department, who was present at the conference, stated that this charge was without foundation, as he had investigated all charges to that effect and found no evidence of any effort made by the officers of Quick Charge to influence the voters in any manner and that the election was fairly conducted.

Soon after the picketing began, notices that the Quick Charge properties were being picketed were issued by Local No. 886 and posted in the local offices of all transportation companies utilized by the debtor in delivering merchandise to the debtor and in receiving merchandise from the debtor for transportation. These notices were followed by personal visits of the organizers and other representatives of Lo-

cal No. 886, who advised the transportation companies that they must not deliver merchandise to the debtor or receive merchandise from the debtor, and if those instructions were violated, that pickets would be placed about the local offices of said transportation companies.

Manufacturers and jobbers were also notified not to sell and deliver merchandise to the debtor, under penalty of having their own places of business picketed, and one manufacturer who did deliver merchandise to the debtor had its place of business picketed, until it complied with the union's demand.

According to the evidence, more than 90 per cent. of incoming and outgoing merchandise for the debtor was handled by truck lines, and soon after the picket line was formed at the debtor's place of business and the notices were posted as hereinbefore stated, all transportation companies refused to deliver merchandise to the debtor, many of them holding merchandise on their docks without notifying the debtor and many returning the merchandise to the original shipper without any notice to the debtor.

This so affected the business of the debtor that it could not carry on its business or meet its payrolls, and on June 20, 1946, the debtor filed its original petition for reorganization under Chapter 10 of the Bankruptcy Act, 52 Stat. 840, 883, 11 U.S.C.A. §§ 501–676, affecting the secured and unsecured claims and stock interests. The petition was duly presented on that date and approved by the court by a proper order, which contained the following: "(3) Until otherwise ordered, all of the creditors of said debtor, secured and unsecured, be, and they hereby are, restrained and enjoined from instituting and prosecuting any suits or actions, at law or otherwise, against said debtor; and said creditors, and all persons, firms, corporations and associations, organized or unorganized, claiming and/or asserting any interest of whatever nature against said debtor and/or its properties, be, and they hereby are, restrained and enjoined from in any manner interfering with said debtor in the possession, use, and operation of its properties."

Under said order August 15, 1946 was fixed as the date for the final hearing of said petition, at which time an order was made and entered approving said petition and continuing the debtor in possession of its properties, with the right of operation thereof in due course, which order contained the following: "(5) Until otherwise ordered, all of the creditors of said debtor, secured and unsecured, be, and they hereby are, restrained and enjoined from instituting and prosecuting any suits or actions at law or otherwise against said debtor; that said creditors, secured and unsecured, and all persons, firms, corporations, partnerships, associations and organizations, organized and unorganized, be, and they hereby are, restrained and enjoined from in any manner interfering with said debtor in the possession, control and operation of its properties under the orders and directions of this Court and subject to its supervision, and from interfering in any manner with the exclusive jurisdiction of this Court over said debtor and its properties and assets, wherever situated."

The debtor, under said orders of June 20, 1946 and August 15, 1946, has remained in possession of its properties and assets, and has operated its business in due course, subject to the supervision of this court.

Notwithstanding the orders of the bankruptcy court, the picketing has continued with even more vigorous coercion, and as a result the orders of this court have been treated with utmost contempt, and during the trial of this cause the fact that said picketing was still in force was boldly admitted by respondents.

The debtor is now and has been for several years engaged in the manufacturing business at 1715 North East Tenth Street, Oklahoma City, Oklahoma, owning its place of business consisting of a modern up-to-date manufacturing plant, representing an investment of approximately $60,000. It manufactures battery chargers, parts and equipment, and steam cleaning devices, which it sells and distributes to filling stations, garages and other concerns throughout the United States and in foreign countries. The battery charger which it manufactures and sells is well and favorably known throughout the United States and many foreign countries and is in great demand. There are approximately 155 items required in its manufacture, some of which the debtor itself manufactures, but it is necessary to buy others from manufacturers outside of Oklahoma.

In order for debtor to successfully and profitably maintain and operate its manufacturing and distributing business, it is necessary to use motor freight transportation services to secure deliveries of raw materials and to ship its manufactured products, except as to the necessary steel wherein it uses the regular railway freight service. Its manufacturing business is highly competitive and prompt service is essential to meet competition.

On May 13, 1946, the date when the picketing commenced, there were approximately 36 concerns, with officers and terminal facilities in Oklahoma City, operating as common carriers for the transportation of freight by motor vehicles in and out of Oklahoma City. These concerns collectively will be hereinafter referred to as "motor freight carriers." Through these motor freight carriers the debtor distributed its manufactured products with speed and promptness to any point in Oklahoma, the United States and in foreign commerce as well. Through these motor freight carriers it could, and did, receive with speed and promptness from various states the necessary raw material, equipment and supplies with which to conduct its manufacturing business.

The nature, character and extent of debtor's business are such that the services of the motor freight carriers are vital and essential to the efficient, economical, profitable and successful operation of its business. The officers and members of Local No. 886 knew when said picket line was established the then prevailing policy of the debtor as to the use of the services of said motor freight carriers, and that such use was essential to the successful and efficient operation of debtor's properties. Since the establishment of the picket line and the

entry of the court orders of June 20, 1946 and August 15, 1946, said union, through its officers, members and organizers, has gone to great lengths to prevent the debtor from using the services of said motor freight carriers. On one occasion, threatening to stone a truck and actually throwing a stone through the windshield of one of the carrier trucks. By reason of its acts and conduct in this regard, the debtor has been deprived of the use of the services of said motor freight carriers and has suffered, and will continue to suffer, irreparable injury and loss.

On May 13, 1946, practically all of the motor freight carriers had a union contract with Local No. 886 and have contracts at this time. Article 4(a) of this form contract reads: "The employer shall not request or instruct any employee to go through a picket line of a striking union, provided that this provision is not in violation of an existing law. However, the union agrees that in the event of the employer becoming involved in a controversy with any other union, the union will do all in its power to effect a fair settlement."

Shortly after the establishment of the picket line, Local No. 886, through the said James E. Hamilton, caused the following notice to be posted in a public place, at the office, terminal, or some other place, of each of the aforesaid motor frieght carriers, to wit:

"Notice

Please Refer and Adhere to—Article No. 14, Page No. 4, of 886 Existing Oklahoma City Area Pickup and Delivery Contract. Quote

'Members of the Union shall not be allowed to Handle or Haul Freight to or from an Unfair Company, provided that this paragraph is not in violation of an existing law.'

Unfair

• • • •

and the
Quick Charge, Inc.
1750 N. E. 10th, Okla. City
(Signed:) Jas. E. Hamilton"

In addition to the aforesaid notice Local No. 886, on July 23, 1946, mailed or delivered to practically all of said motor freight carriers the following letter:

"To All Motor Freight Operators Operating under Agreement with Local Teamsters Union Number 886

Dear Sir:

Some two months past, this Local Teamsters organization, No. 886, in complying with our organizations policy, was justified in declaring the Quick Charge, Incorporated, 1750 N. E. 10th Street, Oklahoma City, Oklahoma, unfair to the Teamsters Union.

All requirements were consummated, and at the same time, each contractial (sic) firm was properly notified as to this declaration, insisting that each contractial (sic) company comply with Article 9 in the Southwestern Area Over-the-Road Agreement, and Article 4 in the Local Freight Forwarding Agreement.

In recent hours, it has come to the attention of the undersigned that several local freight companies are urging members of the Teamsters organization to violate the above mentioned articles, and unfortunately, it has been reported to the organization. In a few cases, employers and employees are handling shipments to and from Quick Charge, Incorporated.

We have asked both parties to comply with the signed working agreements, and at this time, we wish to assure those who are in violation, and continue to violate the agreement, will suffer an immediate cessation of work.

Sincerely,
/s/ Jas. E. Hamilton
James E. Hamilton, Pres.
Local Union No. 886"

Aside from the foregoing notices Local No. 886 has sent many letters and telegrams to practically all of the motor freight carriers urging them to refuse to receive or deliver shipments of any kind consigned to or going from debtor, threatening them with a strike and cessation of operations if they did not comply with such request, and as a result of the activities of Local No. 886, most of the motor freight carriers have refused to receive any shipments of debtor's manufactured products at Okla-

homa City, and have also refused to receive and handle shipments consigned to it, either from Oklahoma or other states. As a result of these and other activities hereinafter set forth, the debtor is "fenced in" as to the movement of its manufactured products and "fenced out" as to the receipt of the necessary raw materials, supplies and equipment with which to operate its plant.

All of these motor freight carriers are *common carriers,* operating under franchises, and are required by law to render transportation service without discrimination, but as a result of threats, intimidation and coercion by respondents, have been induced to violate the terms of their franchises in order to prevent the picketing of their depots and loading docks. The conduct of respondents in this respect has been unlawful and has resulted in unlawful acts by the various motor freight carriers.

On September 23, 1946, the debtor in possession and as trustee of this court filed its application for an order on the above named respondents to show cause why they, and each of them, should not be adjudged guilty of civil contempt and fined accordingly, alleging actual damages in the sum of $9,000. Thereupon, on the 24th day of September, 1946, this court entered an order on said respondents ordering and directing them to show cause on or before October 7, 1946, why they, and each of them, should not be adjudged guilty of civil contempt and be fined therefor, as prayed for in the application of said debtor. Said cause came on for trial on said order to show cause on the 12th day of November, 1946.

There are two questions involved in this proceeding.

First: Was there, under existing law, a labor dispute which justified picketing, and was the picketing instituted on May 13, 1946, and continued up to the present time, such peaceful picketing as has been determined to be the exercise of free speech as provided in the Constitution? U.S. Const.Amend. 1.

Second: Regardless of whether or not there existed a labor dispute, since the filing of the petition in bankruptcy on June 20, 1946, is the exclusive jurisdiction of this court as granted under the bankruptcy law, such as to give this court power to control, manage and operate the properties involved, without interference by picketing or other acts of Local No. 886 which have interfered seriously with the operation of the debtor's business?

As to the first proposition, it was admitted by counsel for respondents in open court that the only dispute existing in this case is the failure of the employees of debtor to select Local No. 886 as their *bargaining agent.* The evidence fully supports the debtor's contention that there never has been any dispute between the debtor and its employees as to wages, hours of employment or working conditions, and that their relations were harmonious and satisfactory until the appearance of organizers Cranford and Mitchell about March, 1946. There was no offer of proof of any dissatisfaction of any character prior to the picketing.

It was necessary for the debtor's plant to shut down on or about April 12, 1946, for lack of material, and when it reopened 10 days later, because of shortage of material, the plant could then use only about 35 employees. The officers of the debtor testified that at the time the picketing began, they had no knowledge of how many, if any, of its employees belonged to the union.

Counsel for respondents urged that an "open shop" was regarded by the union as "immoral" and that it was against the policy of the union to permit an "immoral" plant to operate. Upon what principle of law or ethics this code of morals was based was not disclosed.

The Norris-LaGuardia Act has been held constitutional by our highest court, and for that reason will be so regarded insofar as this case is concerned. It is difficult, however, for the trial court to construe the Constitution so as to deny rights to one class of citizens which are freely given to another class.

Rights preserved to every citizen by the Constitution are sacred, among which are life, liberty and property, of which no citi-

zen may be "deprived" without "due process of law."

What constitutes a "labor dispute" has been the subject of conflicting opinions by our courts. The Norris-LaGuardia Act, in attempting to define "labor dispute," leaves the most diligent student in a maze of doubt.

■ The fundamental conception of a labor dispute is that it is a dispute of some character arising between employer and employee. The Act, however, enlarges this definition to include disputes between employers and between employees. A most reasonable conclusion is that it must have its basis in relationship to wages, hours of employment, and working conditions, and is not an imaginative grievance existing merely in the mind of one party. American Medical Association v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434.

There is a time-honored principle that the "laborer is worthy of his hire," meaning that an employee is entitled to wages commensurate with the service rendered. The hours of employment should be reasonable, taking into consideration periods of rest and recreation necessary to preserve health and provide a decent home and family existence. Slavery in any form is repulsive to our form of government and our way of life. An employee also is entitled to the enjoyment of working conditions which are not detrimental to health and to such reasonable conveniences as all the circumstances require.

■ These three elements, for many decades, have formed the basis for controversies between employer and employee. In the early stages of our industrial development, the individual employee, often uneducated and inexperienced, was at a great disadvantage in dealing with his employer as to his rights. Organization of employees into groups to deal with their employers developed, and what is now recognized as organized labor resulted. These groups select representatives known as "bargaining agents" to represent the employees in their negotiations with their employers with respect to wages, hours of employment and working conditions. Our present statutes governing employer and employee are the result of the natural development in our industrial system of this relationship, and recognize a bargaining agent as an essential element in negotions between employer and employee. The statute providing a definite procedure for the selection of a bargaining agent 29 U.S.C.A. § 151 et seq., is not a meaningless statute, and if an election is had in compliance therewith, the result of the election is binding upon the participating parties. Amalgamated Utility Workers (C.I.O.) v. Consolidated Edison Co. of New York et al., 309 U.S. 261, 60 S.Ct. 561, 84 L. Ed. 738.

Local No. 886 pursued its statutory remedy to secure its designation as bargaining agent of the debtor's employees. An election was held under the direction of the National Labor Relations Board to determine that question and the employees, by a substantial majority, voted against Local No. 886 as their bargaining agent. How then can Local No. 886 contend now that there is a "labor dispute" between it and debtor, or the employees of debtor, when it has been denied the right to act as bargaining agent by a majority of the employees, and has failed to take any steps to have the National Labor Relations Board review said election?

■ This court is forced to the conclusion that there is no labor dispute involved herein. If there is no labor dispute, what right has Local No. 886 to establish a picket line about debtor's place of business? There is no strike. None of the employees have left their jobs and the sole purpose of the picket line is to intimidate, coerce and force debtor's employees to accept Local No. 886 as their bargaining agent, notwithstanding the decision of the employees to the contrary. The picket placards state that the debtor is "unfair" to organized labor. Under the evidence this is untrue, for debtor has complied strictly with every provision of the statute and has at all times indicated its willingness to treat with any bargaining agent selected by a majority of its employees.

Local No. 886 contends that it has a right to picket and label debtor as "unfair" as an expression of free speech under the grant of the Constitution, and in attempting to take advantage of this so-called constitu-

tional right, has been guilty of the following:

1. It has placed a picket line about debtor's place of business, with placards labeling debtor "unfair to organized labor."

2. It has notified all motor freight carriers not to deliver to or receive from, debtor any merchandise, under penalty of having their places of business picketed, and thus destroy their business, and has even had a rock thrown through the windshield of one of the motor trucks.

3. It has caused motor freight carriers to leave merchandise consigned to debtor on their docks, and in many instances to return it to the consignor, all without notice to debtor.

4. It has notified other business houses which have done business regularly with debtor, to discontinue business relations with debtor, or be picketed as "unfair to organized labor," and has actually picketed one such institution for delivering merchandise to debtor.

5. It has in effect taken the position that debtor has no right to exist unless Local No. 886 be designated as bargaining agent, and that the only course left to debtor is unionize or go out of business.

█ If the conduct of Local No. 886, as shown by this record, is an expression of constitutional free speech, then "highjacking" should be designated as a mere incident to physical exercise, and the destruction of private property as an innocent pastime.

█ It is a fundamental principle of law, as old as the institution of courts, that property in the possession of a court having jurisdiction of the person and the subject matter of the litigation is in "custodia legis" and that any unauthorized interference with such possession is punishable as a contempt. It is equally as fundamental that a court of equity has the inherent power to issue such orders and injunctions as may be necessary to prevent the defeat or impairment of its jurisdiction. If these fundamental principles were not so inherent in the court, such a court would indeed be a feeble arm of the government and for all practical purposes would be a nullity.

In Re Tyler, 149 U.S. 164, 181, 13 S.Ct. 785, 789, 37 L.Ed. 689, the principle was expressed in clear and unmistakable language as follows: "No rule is better settled than that, when a court has appointed a receiver, his possession is the possession of the court, for the benefit of the parties to the suit and all concerned, and cannot be disturbed without the leave of the court, and that if any person, without leave, intentionally interferes with such possession, he necessarily commits a contempt of court, and is liable to punishment therefor. (Citing authorities.)"

In Clay v. Waters, 8 Cir., 178 F. 385, 390, 394, 21 Ann.Cas. 897, Circuit Judge Sanborn speaking for the court laid down some very definite rules that have not been departed from since that decision in 1910, reading as follows:

"* * * An adjudication in bankruptcy is a seizure by the court of bankruptcy and a transfer to that court of all property in the possession of the bankrupt at the time of the adjudication in which he has any interest. Thenceforth such property is a part of the trust estate in the legal custody of the court for the benefit of the creditors of the bankrupt and adverse claimants. (Citing numerous authorities.)

"Any willful interference with any of this trust estate, any willful attempt to injure it, to withdraw it from the custody of the court, or to conceal it from the court or any of its officers whose duty it is to administer it, is a defiance of the power and an affront to the dignity of the court which may be punished by a judgment for contempt. * * *"

* * * * * *

"* * * Attention is sharply challenged to the fact that there was no restraining order or specific injunction against the taking and conversion of the property of the bankrupt by this defendant. But the filing of the petition in bankruptcy and the adjudication which followed it embodied in themselves a commanding injunction of the court against the interference of the defendant with and his concealment and removal from the trustee and the court of any of the property of the bankrupt. Against the defendant

and against all others who had no valid lien upon or interest in that property at the time of the adjudication, the injunction and command of the court against such interference and removal and notice thereof to all the world were embodied in the injunction and issued therewith by the settled law of the land. (Citing numerous authorities.)" Id., 178 A. at page 394.

In Ex parte Baldwin et al., 291 U.S. 610, 615, 54 S.Ct. 551, 553, 78 L.Ed. 1020, Mr. Justice Brandeis delivering the opinion of the court, said:

"First. All property in the possession of a bankrupt of which he claims the ownership passes, upon the filing of a petition in bankruptcy, into the custody of the court of bankruptcy. To protect its jurisdiction from interference, that court may issue an injunction. The power is not peculiar to bankruptcy or to the federal courts. It is an application of the general principle that, where a court of competent jurisdiction has, through its officers, taken property into its possession, the property is thereby *withdrawn* from the jurisdiction of other courts. Having possession, *the court may not only issue all writs necessary to protect its possession from physical interference, but is entitled to determine all questions respecting the same.* Julian v. Central Trust Co., 193 U.S. 93, 112, 24 S.Ct. 399, 48 L.Ed. 629; compare Riehle v. Margolies, 279 U.S. 218, 223, 49 S.Ct. 310, 73 L.Ed. 669; Straton v. New, 283 U.S. [318], 319, 51 S.Ct. 465, 75 L.Ed. 1060. *The jurisdiction in such cases is exclusive of the jurisdiction of other courts,* although otherwise the controversy would be cognizable in them. Murphy v. John Hofman Co., 211 U.S. 562, 569, 29 S.Ct. 154, 53 L.Ed. 327. * * *

* * * * * *

"Third. The inherent power of the bankruptcy court to protect its jurisdiction, over property of which it has taken possession, from interference by suit thereafter begun in a state court, has not been abridged by any legislation of Congress. The power is expressly reserved to the bankruptcy court in Judicial Code § 265, (28 U.S.C.A. § 379), which contains the general prohibition against staying proceedings in state courts. Nor is this power of the bankruptcy court affected by section 23(a) of the Bankruptcy Act of 1898, c. 541, 30 Stat. 552 [11 U.S.C.A. § 46, [sub.] (a)], which declares:

" 'The United States circuit (district) courts shall have jurisdiction of all controversies at law and in equity, as distinguished from proceedings in bankruptcy, between trustees as such and adverse claimants concerning the property acquired or claimed by the trustees, in the same manner and to the same extent only as though bankruptcy proceedings had not been instituted and such controversies had been between the bankrupts and such adverse claimants.'

"That section relates only to suits in which the trustees are plaintiffs. It has no restrictive effect on the right of trustees or receivers to protect their possession or title through proceedings in the bankruptcy court.

"Nor is the inherent power of the bankruptcy court to protect its jurisdiction in respect to property of which it has taken possession abridged by Judicial Code § 66 [28 U.S.C.A. § 125], which declares:

" 'Every receiver or manager of any property appointed by any court of the United States may be sued in respect of any act or transaction of his in carrying on the business connected with such property, without the previous leave of the court in which such receiver or manager was appointed; but such suit shall be subject to the general equity jurisdiction of the court in which such manager or receiver was appointed so far as the same may be necessary to the ends of justice.'

"That section does not abridge the exclusive jurisdiction of the court over property of which it has taken possession. In re Tyler, 149 U.S. [164] 165, 182–184, 13 S.Ct. 785, 37 L.Ed. 689.

* * * * * *

" * * * It is sufficient that the extraordinary remedy of mandamus should be denied, *because the trustees may by the common remedy of injunction prevent any interference with the jurisdiction of the bankruptcy court.* * * *" (Emphasis supplied.)

■ Thus, it is well settled that when the petition for reorganization in a bankruptcy proceeding is approved, the rights of others which would interfere with the exclusive jurisdiction of the bankruptcy court are *suspended for the time being for the purpose of the act in reorganization.*

Early in 1935, in Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co., 294 U.S. 648, 661, 55 S.Ct. 595, 600, 79 L.Ed. 1110, that court said:

"By the Act of March 3, 1933, c. 204, 47 Stat. 1467, [11 U.S.C.A. §§ 201 and note, 202–205], original jurisdiction, in addition to that theretofore exercised in voluntary and involuntary proceedings to adjudge persons bankrupt, was conferred upon courts of bankruptcy 'in proceedings for the relief of debtors,' as provided in sections 74, 75 and 77 of the act [11 U.S. C.A. §§ 202, 203, and 205]. We are here concerned only with section 77 (11 U.S. C.A. § 205). That section contains provisions for the reorganization of railroads engaged in interstate commerce. It permits any railroad corporation which is insolvent or unable to meet its debts as they mature to effect a plan of reorganization.

"It provides for the filing of a petition by the railroad corporation in a court designated by the act. If the petition be approved, *the court, during the pendency of the proceedings, is given exclusive jurisdiction of the debtor and its property wherever located.* * * *

\* \* \* \* \* \*

"Moreover, by section 2(15) of the Bankruptcy Act (U.S.C., Title 11, § 11, 11 U.S.C.A. § 11(15), courts of bankruptcy are invested with such authority in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings, including the power to 'make such orders, issue such process, and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of this act.' It may be that in an *ordinary* bankruptcy proceeding the issue of an injunction in the circumstances here presented would not be sustained. As to that it is not necessary to express an opinion. *But a proceed-*

*ing under section 77 (11 U.S.C.A. § 205), is not an ordinary proceeding in bankruptcy.* It is a *special* proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised. *And to prevent the attainment of that object is to defeat the very end the accomplishment of which was the sole aim of the section, and thereby to render its provisions futile.*

"The bankruptcy court, in granting the injunction, was well within its power, either as a virtual court of equity, or under the broad provisions of section 2(15) of the Bankruptcy Act (11 U.S.C.A. § 11(15), or of section 262 of the Judicial Code [28 U.S.C.A. § 377]." Id., 294 U.S. at page 676, 55 S.Ct. at page 606, 79 L.Ed. 1110.

\* \* \* \* \* \*

"Third. It is evident that the effect here wrought by the menace of impending sales of the collateral would seriously embarrass and probably prevent the formulation and consummation of a plan of reorganization. Both courts below so found. The findings of the district court are in the form of recitals in the order, but are nevertheless in substance and in effect findings of fact. The circuit court of appeals approved these findings, and added that without some control over the disposition of the collateral, '*the presentation of a satisfactory plan of reorganization might as well be abandoned.*' \* \* \*" Id., 294 U.S. at page 678, 55 S.Ct. at page 607, 79 L.Ed. 1110.

\* \* \* \* \* \*

"The injunction here goes no further than to delay the enforcement of the contract. It affects only the remedy. As already appears, this court has upheld the power of a court of bankruptcy to stay the enforcement of the remedy under a real-estate mortgage; and the remedy under a pledge, so far as constitutional power is here concerned, presents a situation strictly analogous in character." Id., 294 U.S. at page 681, 55 S.Ct. at page 608, 79 L.Ed. 1110. (Emphasis supplied.)

The general revision of the Bankruptcy Act, or amendatory Act of 1938 known as the Chandler Act, became effective September 22, 1938. Since that time corporate

reorganizations have been fostered and encouraged. Those sections pertinent here are as follows:

Section 511: "Where not inconsistent with the provisions of this chapter, the court in which a petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and its property, wherever located."

Section 515: "Upon the approval of a petition, the court shall have and may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon it, exercise all the powers, not inconsistent with the provisions of this chapter, which a court of the United States would have if it had appointed a receiver in equity of the property of the debtor on the ground of insolvency or inability to meet its debts as they mature."

Section 567: "The trustee upon his appointment and qualification—* * * (4) may, subject to the approval of the judge, employ such person or persons as the judge may deem necessary for the purpose of assisting the trustee in performing the duties imposed upon him under this chapter; * * * ."

Section 588: "A debtor continued in possession of its property shall have all the title, be vested with all the rights, be subject to all the duties, and exercise all the powers of a trustee appointed under this chapter, subject, however, at all times to the control of the judge and to such limitations, restrictions, terms, and conditions as the judge may from time to time prescribe."

Section 589: "A trustee or debtor in possession, upon authorization by the judge, shall operate the business and manage the property of the debtor during such period, limited or indefinite, as the judge may from time to time fix, and during such operation or management shall file reports thereof with the court at such intervals as the court may designate."

Section 591: "A trustee or debtor in possession may employ officers of the debtor at rates of compensation to be approved by the court. No person shall become an officer or director of the debtor, to fill a vacancy or otherwise, without the prior approval of the court."

Section 606: "The debtor, the indenture trustees, and any creditor or stockholder of the debtor shall have the right to be heard on all matters arising in a proceeding under this chapter. The judge may, for cause shown, permit a labor union or employees' association, representative of employees of the debtor, to be heard on the economic soundness of the plan affecting the interests of the employees."

Section 672: "The right of employees or of persons seeking employment on the property of a debtor under the jurisdiction of the court to join a labor organization of their choice, or to refuse to join or remain members of a company union, shall be free from interference, restraint, or coercion by the court, a debtor, or trustee. It shall be the duty of a debtor or trustee to report to the judge any agreement restricting or interfering with such right, and the judge shall thereupon enter an appropriate order for the termination of such agreement and for notice to the employees that the same is no longer binding upon them. No funds of the estate shall be used by a debtor or a trustee for the purpose of maintaining company unions."

The statute has for its purpose the rehabilitation of distressed business organizations through a plan of reorganization. The effect is to place every phase of the debtor's business under the supervision of the court which has exclusive jurisdiction over the debtor and his property during the reorganization period.

In a recent case, decided June 7, 1943, In re Cuyahoga Finance Company, 6 Cir., 136 F.2d 18, 20, the court said:

"One of the purposes of the statute was the enlargement of the jurisdiction of the court. The restrictions of Section 23, 11 U.S.C.A. § 46 were abrogated unless the proceeding degenerated into ordinary bankruptcy. The statute expanded the former Act to give the court in reorganization proceedings such jurisdiction as a court of the United States would have if it had appointed a receiver in equity of the property of the debtor on the ground of insolvency or

inability to meet debts as they matured. 11 U.S.C.A. § 515, 52 Stat. 884.

"Under the equity powers in an insolvency proceeding, the appointment of a receiver confers upon the court jurisdiction to decide all questions incident to the preservation, collection and distribution of the assets regardless of citizenship or the amount in controversy. Riehle v. Margolies, 279 U.S. 218, 223, 49 S.Ct. 310, 73 L.Ed. 669. * * * and the court may issue all writs necessary for the exercise of its equity powers and to protect from interference all property, actually or constructively in its possession. Continental Illinois Nat. Bank v. [Chicago] Rock Island [& P.] Railway, 294 U.S. 648, 676, 55 S.Ct. 595, 79 L. Ed. 1110; Julian v. Central Trust Company, 193 U.S. 93, 112, 24 S.Ct. 399, 48 L. Ed. 629.

"* * * The *core of the Act* is uniting in a bankruptcy court, the traditional law and equity power of courts *with authority to administer* legal and equitable relief in a single action.

"The Act places under the jurisdiction of the court all the tangible and intangible assets of the corporation whether or not in its possession so that in a single action, it may adjust conflicting claims. *A distinct purpose of the amendment to the Bankruptcy Act was to subject the administration of the corporation, during the period of reorganization or rehabilitation, to the control of tribunals clothed with authority and charged with the duty to proceed to consummation of a* plan or reorganization in a summary way." (Emphasis supplied.)

In Re Standard Gas & Electric Company, 3 Cir., 139 F.2d 149, 152, the court said:

"It will hardly be questioned that a District Court has power to protect by injunction its exclusive jurisdiction over the property and assets of a bankrupt. And the same is true with respect to the property and assets of a debtor or the proceedings in bankruptcy for the debtor's reorganization. Cf. Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; * * *. The power of a bankruptcy court to protect by injunction the subject-matter of its jurisdiction is inherent in the court as a virtual court of equity and exists as well by virtue of sec. 2(15) of the Bankruptcy Act, 11 U.S.C.A. § 11(15), and the 'all writs' provision of sec. 262 of the Judicial Code, 28 U.S.C.A. § 377. * * *

* * * * * *

"* * * But the debtor is no longer possessed of any *right* to prosecute the cause of action. *That right has passed to the special trustee* by virtue of the bankruptcy proceeding and the court's exercise of its competent jurisdiction. * * *" (Emphasis supplied.)

In John Hancock Mutual Life Insurance Company v. Casey, 1 Cir., 134 F.2d 162, decided March 1, 1943 (certiorari denied May 24, 1943, 319 U.S. 757, 63 S.Ct. 1176, 87 L. Ed. 1709), the appeal raised the question whether the district court, after approval of the petition, had the power to take possession of mortgaged premises, collect the rents, and enjoin the mortgagee from interfering therewith by foreclosure or otherwise. It was held that under the authority of Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & P. Railway, 294 U.S. 648, 675, 55 S.Ct. 595, 79 L.Ed. 1110, supra, the court had such power, and as to the "rights" of the mortgagee, the court said [134 F.2d 163]: "The rights of the mortgagee under its Massachusetts form of mortgage to take possession and foreclose on breach of condition were not impaired, from a constitutional point of view, by the exercise of the authority conferred by the Bankruptcy Act. *The exercise of those rights were suspended for the time being for the purposes of the Act, the constitutionality of which cannot now be doubted.*" (Emphasis supplied.)

The respondents contend they are within their rights by virtue of the Norris-LaGuardia Act which prohibits federal courts issuing injunctions in labor disputes. Whether a "labor dispute" is involved here is beside the question. These two statutes must be reconciled; they cannot both control. The Norris-LaGuardia Act was passed March 23, 1932 and the Chandler Act was passed June 22, 1938, more than six years later. That the Congress intended the Chandler Act to prevail where there was

conflict by virtue of it being later legislation cannot be doubted, and particularly is this convincing when sections 606 and 672 of the Chandler Act, supra, are considered. But here the court is not dealing with an injunction issued in a "labor dispute" in any sense. The petition in bankruptcy was filed June 20, 1946, was duly approved, and the statutory notice properly given.

In Converse et al. v. Highway Construction Co. of Ohio, Inc., 6 Cir., 107 F.2d 127, 129–131, decided November 8, 1939, which authority apparently is the settled law and has been quoted with approval numerous times by our highest court, all questions raised in the instant case are answered as follows:

"It follows from these provisions that the rule is applicable that the filing of a petition under section 77B [11 U.S.C.A. § 207], when approved by the court, *is a caveat to all the world* that it is in effect an attachment and injunction and that the title to the bankrupt's property has become vested in its trustee with actual or constructive possession in the custody of the bankruptcy court. (Citing authorities.)

"The order of injunction in question was not only in personam but also operated in rem to prevent interference with or the invasion of the property rights of the debtor. It was broad enough in its terms to enjoin all persons from interfering with the property in custodia legis and was sufficient as a public record to impart constructive notice to all.

"As we view the case, the question of the injunction is immaterial. The rule is applicable under a 77B proceeding that when the petition is approved by the court and it continues the officers of the corporation in possession of the property, it is in the custody of the court and it is not competent for any person to interfere with the possession of the corporate officers without first obtaining its consent. We consider this rule of such importance to the interest and safety of the public and the administration of justice it should be inflexibly maintained on all occasions.

\* \* \* \* \* \*

"The court was not compelled to observe the inhibitions of 29 U.S.C.A. § 107 and other related sections commonly known as the Norris-LaGuardia Anti-Injunction Act of March 23, 1932 (29 U.S.C.A. §§ 101–115). *The right of the Bankruptcy Court is inherent to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction.* Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Railway Company, 294 U.S. 648, 676, 55 S.Ct. 595, 79 L.Ed. 1110; Ex parte Baldwin, 291 U.S. 610, 615, 54 S.Ct. 551, 78 L.Ed. 1020.

"The injunctive order here complained of had no relation to a labor dispute at the time of its entry. It was the usual one entered in bankruptcy cases under section 77B for the protection and preservation of the bankruptcy estate pending the proceedings. \* \* \*

\* \* \* \* \* \*

"Regardless of the instructions of Converse, the debtor bid on the public construction contracts, refused to heed his request to join the Pavers Exchange and declined to employ superintendents, foremen and timekeepers of his union or to require its employees occupying those positions to join the union. Following this, appellants, acting jointly and severally, so interfered with the conduct of the debtor's business by placing pickets in large numbers about its equipment, thus preventing its employees from operating it, that its work was discontinued until the order of citation herein was issued.

"A labor dispute, as used in the Norris-LaGuardia Act, comprehends 'disputes growing out of labor relations and implies the existence of relation of employer and employee'. United Electric Coal Companies v. Rice, 7 Cir., 80 F.2d 1. In the case at bar there was no real controversy between the debtor and its employees concerning terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment. Stripped of excuses, appellants were by interference and coercion attempting to compel the debtor to become a member of a contractors' association in Cuyahoga County, Ohio, the primary purpose of which was to destroy competition in the highway con-

struction business in that county. Wages and working conditions were incidental. The refusal of the debtor to accede to the unauthorized and unwarranted demands of appellants can be in no sense termed a labor dispute as defined in section 13(c) of the Norris-LaGuardia Act. Application of that Act to the case at bar would be a distortion of its purpose not intended by Congress. Scavenger Service Corporation v. Courtney, 7 Cir., 85 F.2d 825.

"It is well-settled law that whoever unlawfully interferes with property in the possession of a court is guilty of contempt and it is equally settled that whoever unlawfully interferes with officers and agents of the court in the full and complete possession and management of property is guilty of contempt. It is of no consequence whether the interference results in actual violence or only in intimidation or threats. Ex parte Tyler, Petitioner, 149 U.S. 164, 191, 13 S.Ct. 785, 37 L.Ed. 689." (Emphasis supplied.)

In the recent case of Duggan, Trustee v. Sansberry, Trustee, 327 U.S. 499, 510, 511, 66 S.Ct. 657, 662, decided March 4, 1946, the bankruptcy court in reorganization proceedings was held to have the power to stay a scheduled sale of property in another bankruptcy court. The opinion, written by Mr. Justice Rutledge states:

"The problem involves, of course, not the ordinary power of one court of general jurisdiction to question the jurisdiction of another court of general jurisdiction. The jurisdiction of both the bankruptcy forum and the reorganization forum is derived from and is limited by the Bankruptcy Act, enacted in accordance with the congressional power 'to establish * * * uniform Laws on the subject of Bankruptcies throughout the United States. * * * *' Constitution, Article 1, § 8. *It was within the power of Congress to provide that a bankruptcy court could not permit an attack, even on the usual grounds, to be made upon proceedings initiated in a reorganization court.* This power Congress exercised by permitting the reorganization court to stay, as it did, the bankruptcy proceedings.

"The exercise of this power, taken in relation to the facts at bar, was in pursuance of the congressional intention ordinarily to allow parent and subsidiary to be reorganized in a single proceeding, thereby effectuating its general policy that the entire administration of an estate should be centralized in a single reorganization court. *If the reorganization forum lacked the power to stay the bankruptcy proceeding and thereby to prevent a collateral inquiry into its own jurisdiction, this policy of Congress would be frustrated; for instead of one court's having 'exclusive jurisdiction of the debtor and its property, wherever located,' there would be two courts each with a claim to jurisdiction and each denying the other's jurisdiction. We may not construe the Bankruptcy Act as permitting such a state of affairs.*" (Emphasis supplied.)

From a careful consideration of the foregoing authorities it is clear:

First. That under the Chandler Act the court is vested with exclusive jurisdiction of the debtor, his property and the operation of debtor's business in reorganization proceedings in bankruptcy, upon the approval of the petition.

Second. That in the exercise of that exclusive jurisdiction, the court is vested with the power to issue all writs necessary to protect that jurisdiction against all willful and unauthorized interference from any source that would defeat or impair that jurisdiction.

Third. That the court, in such reorganization proceedings, has not only the power, but is charged with the duty to determine all questions respecting such interference.

Fourth. That the rights of all parties, in any manner interested, are suspended and subordinated to the jurisdiction of the court during the reorganization period, and that the court is in complete and exclusive control of the debtor, his assets and his business during such period, and that any willful and unauthorized interference by any person or from any source that may defeat or impair the purposes of the statute is a contempt of court and is punishable as such.

The acts of the respondents are a menace and do seriously embarrass and interfere with any plan of reorganization,

and if continued, will prevent the consummation thereof.

This court concludes that, under the first proposition, there is no labor dispute involved, and under the second proposition, even though there were a labor dispute involved, the exclusive jurisdiction of the bankruptcy court in a reorganization proceeding prohibits the application of the Norris-LaGuardia Act.

The court finds that the respondents, Local No. 886, James E. Hamilton, H. L. Cranford and Maurice E. Mitchell, are in contempt of this court and should be so adjudged. The case has been dismissed as to respondent G. R. Stewart, and the court finds that the acts of respondents C. A. Ward and S. A. Ambrister were purely ministerial and were done under the direction of respondent Hamilton.

For the purpose of fixing the punishment, this proceeding will be continued until the 6th day of February, 1947 at which time a further hearing will be had.