In re Bob Landy REED, dba the Old Firehouse Restaurant No. 1, aka Bob L. Reed and Bob Reed; and Carol P. Reed, aka Carol Reed, aka Carol P. Rodriguez, Carol Rodriguez and Mrs. Bob L. Reed, Debtors.

In re Richard Earl HUBBARD, Debtor.

Bankruptcy Nos. 80–01785, 80–00082.

United States Bankruptcy Court,
D. Utah.

May 15, 1981.

George M. McCune, Provo, Utah, for debtors Reed et al.

Mark F. Robinson, Provo, Utah, for respondents, Todd Bona, Holly Broadhead, Norman Broadhead, Betty Quinn, Minnie Sparton.

Blaine Ferguson, Salt Lake City, Utah, for debtor Hubbard.

Dennis L. Draney, Roosevelt, Utah, for respondent, Uintah Basin Telephone Association.

Judith Boulden, Salt Lake City, Utah, for herself as trustee.

## MEMORANDUM OPINION

RALPH R. MABEY, Bankruptcy Judge.

### INTRODUCTION

These cases are consolidated to consider issues concerning the contempt authority of this Court. Both ask how to categorize civil versus criminal contempt. Both ask whether creditors who knew of the bankruptcy, but who may not have received notice of the automatic stay,[1] may be held in con-

---

1. The automatic stay is defined at 11 U.S.C. Section 362(a) which provides:

(a) Except as provided in subsection (b) of this section, a petition filed under sections 301, 302, and 303 of this title operates as a stay, applicable to all entities, of

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of estate or of property from the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose

tempt for violating the stay, and whether the order announcing the stay is sufficiently definite and precise to trigger a citation for contempt. Both wrestle with the question of remedies for contempt. No party in either case has argued any procedural error. The focus, therefore, is the scope and relief under the contempt power as applied to transgressions of the automatic stay. All respondents are found in civil contempt and ordered to make reparation to debtors upon the following analysis.

### THE REED CASE

Debtors, Bob and Carol Reed, doing business as The Old Firehouse Restaurant No. 1, filed their petition under Chapter 7 on September 12, 1980. The order for the first meeting of creditors and notice of the automatic stay were mailed to most parties in interest on September 19, but through inadvertence, were not sent to respondents until October 9.

Respondents, who sold the restaurant to debtors, and who are therefore creditors of the estate, were concerned about food spoilage and the resulting smell (T. 51, ls. 3–16). They contacted the trustee, obtained a key from him, and visited the premises on October 12. While unsure whether they had permission to remove property (compare T. 43, ls. 13–19 with 52, ls. 17–23), they nevertheless loaded several garbage cans, plastic bags, and containers full of fish, flour, pickles, onions, and dressings and drove to debtors' residence. Respondent Minnie Spatton and her grandson knocked at the back door. Carol Reed answered. Spatton said, "I have something for Bob that he left at the Firehouse. I worked ten long years for

this," and dropped one sack of garbage, letting it break and spill open on the porch (Carol Reed Affidavit, ¶ 4; T. 30, ls. 20–23; 38, ls. 6–9). Carol and her mother-in-law, who was staying with the Reeds, then watched from a window while respondents dumped and spread garbage on the driveway and front lawn.

The Court was apprised of these circumstances and issued an order to show cause to respondents on October 14. The order was served on October 15. Respondents filed an "Objection and Traverse to Affidavit in Support of Order to Show Cause In Re Contempt" dated October 30. A hearing was held on October 31, and the Court took the matter under advisement. Additional facts pertinent to the ruling will be set forth below.

*General Principles Respecting Contempt*

■ The contempt power inheres in courts; it is necessary to insure obedience to their commands. *See, e. g., Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *Ex Parte Robinson*, 19 Wall. 505, 510, 22 L.Ed. 205 (1873); *United States v. Askew*, 584 F.2d 960, 962 (10th Cir. 1978). It was early determined that bankruptcy courts, as courts of equity, even without statutory authorization, possessed this power. *See, e. g., Boyd v. Glucklich*, 116 F. 131 (8th Cir. 1902). And, indeed, history suggests that, absent statutory delimitation, it may be difficult to contain. *See, e. g., Nye v. United States*, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (1941).[1a]

before the commencement of the case under this title;
 (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;
 (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

**1a.** It may be an open question whether this power can be statutorily restricted. *See, e. g.*, Landers, "The New Bankruptcy Rules: Relics of the Past as Fixtures of the Future," 57 Minn. L.Rev. 827, 866 (1973). For purposes of this opinion, however, the validity of statutory

■ The contempt power under the Code[2] is expressed in 11 U.S.C. Section 105(a) which authorizes the issuance of "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," and 28 U.S.C. Section 1481 which confers the "powers of a court of equity, law, and admiralty." Bankruptcy courts, however, may not punish criminal contempts committed outside their presence or warranting imprisonment.[2a]

These provisions are an expansive departure from Section 41(a) of the Bankruptcy Act, former 11 U.S.C. Section 69(a), which tolerated use of the contempt power only in specified instances.[3] Section 41(a) was superseded, in part, by Rule 920, Fed.R. Bankr.P., which disallowed fines in excess of $250 and provided for the certification of

modification of the contempt power will be assumed.

2. The Code, as used in this opinion, refers to the Bankruptcy Reform Act of 1978, codified at 11 U.S.C. Sections 101 *et seq.*, Pub.L.No.95–598, 92 Stat. 2549 (1978). The Code was enacted on November 6, 1978 and became effective on October 1, 1979.

2a. The Commission on the Bankruptcy Laws of the United States recommended a grant, without reservation, of criminal and civil contempt powers to bankruptcy courts. *See* Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No.93–137; Part II, 31 and 47–48 (1973). By withholding power to punish some criminal contempts, Congress may be accused of employing the "fudge" method. In other words, the limitation may make "no sense in light of the other pronouncements of the draftsmen about increasing the prestige and dignity of the bankruptcy court. The obvious compromise attests to the failure of the draftsmen to resolve current uncertainty concerning the office of the referee and suggests a fundamental dispute as to whether the referee should be a judge. While the Committee was quick and eager to bestow the title, they were obviously hesitant to confer the power which normally accompanies it." Landers, "The New Bankruptcy Rules: Relics of the Past as Fixtures of the Future," 57 Minn.L.Rev. 827, 867 (1973). *But see* Rendleman, "Bankruptcy Revision: Procedure and Process," 53 M.C.L.Rev. 1197, 1215–1216 (1975). Nevertheless, "the requirement that punishment for criminal contempt be imposed by another court reflects good practice insofar as it separates the judge involved in the contemptuous conduct from the trial of the issues raised by the prosecution." Kennedy, "The Bankruptcy Court Under the New Bankruptcy Law: Its Structure and Jurisdiction," 55 Am.Bank.L.J. 63, 90 (1981).

"These limitations raise [another] issue that is unlikely to be noticed on a first reading of the Reform Act. If the appellate process during the transition period has been set up in such a fashion as to relieve the district courts of any appellate jurisdiction, to whom does one go ... if a criminal contempt is to be punished by imprisonment? The jurisdiction granted to the appellate panels to be set up under 28 U.S.C. Section 160 is apparently simply to hear appeals. Thus, nonappellate matters such as contempts ... must still be directed to the district court, notwithstanding 28 U.S.C. Section 1471(c) which states that the bankruptcy courts shall exercise all of the jurisdiction conferred on the district courts." Murphy, Creditors' Rights in Bankruptcy, Section 2.04 at 210 (1980).

3. Former 11 U.S.C. Section 69(a) provided:

(a) A person shall not, in proceedings before a referee, (1) disobey or resist any lawful order, process, or writ; (2) misbehave during a hearing or so near the place thereof as to obstruct the same; (3) neglect to produce, after having been ordered to do so, any pertinent document; or (4) refuse to appear after having been subpoenaed, or, upon appearing, refuse to take the oath as a witness, or having taken the oath, refuse to be examined according to law: *Provided*, That a person other than a bankrupt or, where the bankrupt is a corporation, its officers, or the members of its board of directors or trustees or of other similar controlling bodies, shall not be required to attend as a witness before a referee at a place more than one hundred miles from such person's place of residence or unless his lawful mileage and fee for one day's attendance shall be first paid or tendered to him.

(b) The referee shall forthwith certify the facts to the judge, if any person shall do any of the things forbidden in this section, and he may serve or cause to be served upon such person an order requiring such person to appear before the judge upon a day certain to show cause why he should not be adjudged in contempt by reason of the facts so certified. The judge shall thereupon, in a summary manner, hear the evidence as to the acts complained of and, if it is such as to warrant him in so doing, punish such person in the same manner and to the same extent as for a contempt committed before him, or commit such person upon the same conditions as if the doing of the forbidden act had occurred with reference to the process of the court of bankruptcy or in the presence of the judge.

these and contempts warranting imprisonment to the district court.[4] Indeed, Sections 105 and 1481, read together, are on their face broader not only than Section 41(a) and Rule 920 but also than 18 U.S.C. Section 401 which governs contempt proceedings in other federal courts.[5] Moreover, Section 105 is coextensive with the new jurisdiction of bankruptcy courts, 2 Collier on Bankruptcy, ¶ 105.01 at 105–1 (15th ed. 1980), which in turn surpasses the jurisdiction of other federal courts.[6]

4. Rule 920, Fed.R.Bank.P., provides:

(a) Contempt Committed in Proceedings Before Referee.

(1) Summary Disposition by Referee. Misbehavior prohibited by § 41(a)(2) of the Act may be punished summarily by the referee as contempt if he saw or heard the conduct constituting the contempt and it was committed in his actual presence. The order of contempt shall recite the facts and shall be signed by the referee and entered of record.

(2) Disposition by Referee upon Notice and Hearing. Any other conduct prohibited by § 41(a) of the Act may be punished by the referee only after hearing on notice. The notice shall be in writing and shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the contempt charged and whether the contempt is criminal or civil or both. The notice may be given on the referee's own initiative or on motion by a party, by the United States attorney, or by an attorney appointed by the referee for that purpose. If the contempt charged involves disrespect to or criticism of the referee, he is disqualified from presiding at the hearing except with the consent of the person charged.

(3) Limits on Punishment by Referee. A referee shall not order imprisonment nor impose a fine of more than $250 as punishment for any contempt, civil or criminal.

(4) Certification to District Judge. If it appears to a referee that conduct prohibited by § 41(a) of the Act may warrant punishment by imprisonment or by a fine of more than $250, he may certify the facts to the district judge. On such certification the judge shall proceed as for a contempt not committed in his presence.

(b) Contempt Committed in Proceedings Before District Judge. Any contempt committed in proceedings before a district judge while acting as a bankruptcy judge shall be prosecuted as any other contempt of the district court.

(c) Right to Jury Trial. Nothing in this rule shall be construed to impair the right to jury trial whenever it otherwise exists.

Sections 2(a)(13), 2(a)(15), and 2(a)(16) of the Bankruptcy Act, former 11 U.S.C. Sections 11(a)(13), 11(a)(15), and 11(a)(16), like Section 105, contained broad, general grants of power to regulate contempts. These provisions, however, unlike Section 105, were delimited by Section 41(a) and Rule 920.

Pub.L.No.95–598, Section 404(d) purports to make Section 41(a), as modified by Rule 920, applicable to bankruptcy courts during the transition period from 1979 to 1984. This revival of Section 41(a) however, cannot be reconciled with the contempt authority conferred on bankruptcy courts by Section 1481, which is likewise applicable during the transition period by virtue of Pub.L.No.95–598, Section 405(b). Since under Section 1481 "the bankruptcy court's contempt power is unlimited except as to the criminal contempts there described ... Section 41 cannot be applicable during the same time and Rule 920 must fall, as well, for its lessening of the broad contempt power given by Section 1481 is inconsistent with the latter and must yield under Section 405(d)." 1 Collier on Bankruptcy, ¶ 7.04 at 7–46 (15th ed. 1980). The inclusion of Section 41(a) was "clearly inadvertent" and "must be read out of section 404(d)." *Id.* and n.20. *See also In re Eisenberg*, 7 B.R. 683, 690 (Bkrtcy.E.D.N.Y. 1980) (noting that Congress attempted to cure this defect in the Technical Amendments Bill).

5. 18 U.S.C. Section 401 provides:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

Like Section 41(a), Section 401 tolerates use of the contempt power only in specified instances. It "imposes that limitation by extending the contempt power to misconduct of the types defined in its three subdivisions 'and none other.' " *In re Brown*, 454 F.2d 999, 1003 n.12 (D.C.Cir.1971).

6. The legislative history notes that "the new bankruptcy courts will have contempt power commensurate with their responsibilities, and *equal to* the contempt power of other Federal courts," but concludes that "the new courts must be given adequate power to enforce [their broadened] jurisdiction." H.Rep.No.95–595, 95th Cong., 1st Sess., 13 (1977) U.S.Code Cong. & Admin.News, 5787 (emphasis supplied). Thus, it is unclear whether Congress believed that a greater measure of contempt authority was necessary to compass this jurisdictional field, or merely intended to supply bankruptcy courts with contempt authority commensurate

The intrinsic breadth of the contempt power, however has been questioned on a number of grounds. Speaking philosophically, some have argued that contempts should not be punishable, "for if [they] arose from madness, it was to be pitied; if from levity, to be despised; and if from malice, to be forgiven." Patterson, On Liberty of Speech and Press, 18 (1939). Others have said that "respect by compulsion may be a contradiction in terms," and that obedience should be won through "moral rightness" rather than "artificial might." Goldfarb, The Contempt Power, 10 (1963).

On a more practical note, there is concern that contempt, as the law of kings, and wielded by judges who are men, may too often be exercised to vindicate a mistaken sense of judicial supremacy rather than the public good. After all, "contemptuous conduct, though a public wrong, often strikes at the most vulnerable and human qualities of a judge's temperament." *Bloom v. Illinois*, 391 U.S. 194, 202, 88 S.Ct. 1477, 1482, 20 L.Ed.2d 522 (1968). And "men who make their way to the bench sometimes exhibit vanity, irascibility, narrowness, arrogance, and other weaknesses to which human flesh is heir." *Sacher v. United States*, 343 U.S. 1, 12, 72 S.Ct. 451, 456, 96 L.Ed. 717 (1952).[7] The joinder of such men with a power at once "unbridled" and "liable to abuse" may be unpropitious to say the least. *Bloom v. Illinois, supra*, 391 U.S. at 202, 88 S.Ct. at 1482.

with other federal courts but exercisable over a widened sphere of influence.

The comparative breadth of Section 105, however, may be illustrated by the fact that courts have viewed its narrower predecessor, Section 41(a), as following "substantially" Section 401. *Fernos-Lopez v. United States District Court*, 599 F.2d 1087, 1091 (1st Cir. 1979). *See also* 1 Collier on Bankruptcy, ¶ 2.58 at 314 (14th ed. 1974) (under the old regime "the bankruptcy court [had] no broader power to commit for contempt than other federal courts"); 1 Collier on Bankruptcy, ¶ 3.01 at 3–109 (15th ed. 1980). *But see id.* at 3–110 ("Because specific types of contempt are not set out in the 1978 statute, as they were under the Act, the bankruptcy courts will be governed by ... Section 401"); *In re Eisenberg*, 7 B.R. 683, 689 (Bkrtcy.E.D.N.Y.1980) (because bankruptcy courts are courts of the United States they will be governed by Section 401). Neither Collier nor *Eisenberg* cite any authority for this proposition, and indeed, it is inconsistent with Collier's analysis of the contempt power under the Act and Code found elsewhere in his treatise. *See* 1 Collier on Bankruptcy, ¶ 7.04 at 7–46 (15th ed. 1980), and footnote 4, *supra*.

On the other hand, whether Section 401 restricts not only the criminal but also the civil contempt power of federal courts remains an open question. *See, e. g.*, Note, "The Coercive Function of Civil Contempt," 33 U.Chi.L.Rev. 120, 121 N. 3 (1965) ("These statutes, like many state statutes, are unclear as to whether they apply solely to criminal contempt or whether they are also applicable to civil contempt. The better view, however, is that limitations which these statutes place on the contempt power are inapplicable to coercive imprisonment [citations omitted]. There have been scattered statements to the contrary [citations omitted]. However, the fact that since the 1952 revision of titles 28 and 18, all general contempt statutes have appeared in title 18—'Crimes and Criminal Procedure'—reinforces the view that the provisions are applicable only to criminal contempt"); Note, "Civil and Criminal Contempt in the Federal Courts," 57 Yale L.J. 83, 84 (1947) ("But no federal legislation purporting to regulate civil contempt has ever been enacted and it remains an open question whether even general contempt legislation, with the possible exception of the Norris-La-Guardia Act, is applicable to civil contempt"). Indeed, there is authority suggesting Section 401 may be a limitation only as to summary, as distinct from plenary, criminal contempt power. *See* Dobbs, "Contempt of Court: A Survey," 56 Cornell L.Rev. 183, 222 n.153 (1971).

7. Some would argue that bankruptcy judges are more susceptible to these shortcomings than other federal judges. Justice Douglas, dissenting from the promulgation of Rule 920 in 1973, remarked: "I once knew most of the referees in the Nation and worked with them on various projects. But they, too, flourish under Parkinson's Law; and their power grows like that of a prince in a medieval kingdom. That may not be ominous when it relates only to administrative detail. But it is for me alarming to vest appointees of bankruptcy courts with the power to punish for contempt ... Walter Nelles long ago reminded us that summary procedure of contempt is a 'legal thumb-screw,' the 'most autocratic of judicial powers,' and 'in practice the most indefinite' [citation omitted] ... Extension of the contempt power to administrative arms of the bankruptcy court is not consistent with close confinement of the contempt powers." *Bankruptcy Rules and Official Bankruptcy Forms*, 411 U.S. 991, 993, and 994, 93 S.Ct. 3081, 3082, 3083, 37 L.Ed.2d xxxi-xxxii (1974) (J. Douglas, dissenting).

The power, therefore, "must be narrowly confined lest it become an instrument of tyranny." *Fisher v. Pace*, 336 U.S. 155, 163, 69 S.Ct. 425, 428, 93 L.Ed. 569 (1949) (J. Douglas, dissenting opinion). Contempt opinions are tireless in their admonitions to assure "alert self-restraint," *In re McConnell*, 370 U.S. 230, 233, 82 S.Ct. 1288, 1290, 8 L.Ed.2d 434 (1962), and use of "the least possible power adequate to the end proposed." *In re Michael*, 326 U.S. 224, 227, 66 S.Ct. 78, 79, 90 L.Ed. 30 (1945).

Recent decisions have rehearsed the pruning of the contempt power in federal court, beginning with the Act of 1831 which "narrowly confined" and "substantially curtailed" the power to punish contempt summarily. *Nye v. United States, supra*, 313 U.S. at 47–48, 61 S.Ct. at 815. This history is traced in *Bloom v. Illinois, supra*, 391 U.S. at 202–206, 88 S.Ct. at 1482–1485, which concludes: "This course of events demonstrates the unwisdom of vesting the judiciary with completely untrammeled power to punish for contempt, and makes clear the need for effective safeguards against that power's abuse." *Id.* at 207, 88 S.Ct. at 1485.

In short, "the power of contempt which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court is most important and indispensable. But its exercise is a delicate one and care is needed to avoid arbitrary and oppressive conclusions." *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925).

The starting point for delineating the scope of this power is determining whether the contempt is civil or criminal. Next, the necessity of notice as a condition to finding contempt must be posed. Finally an appropriate sanction must be found.

## Civil Or Criminal Contempt

Whether the contempt is civil or criminal is a threshold issue. Several consequences flow from this categorization. Most obviously, if the contempt is criminal, since it was not committed in the Court's presence, it cannot be punished here and the certification procedures of Rule 920 must be followed. Moreover, criminal contempts are tried under the auspices of Rule 42, Fed.R. Crim.P.,[8] and depending on whether petty or serious in character, may involve the right to trial by jury. *See Bloom v. Illinois, supra.*[9]

**8.** Rule 42, Fed.R.Crim.P., provides:

(a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

(b) Disposition upon Notice and Hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment.

**9.** "If the case is a criminal one, almost the entire panoply of criminal safeguards comes into play. The burden of proof is on the prosecution, the party charged cannot be required to testify against himself, cannot be put in double jeopardy, and cannot be tried without appropriate notice of the charge. Inferentially at least, he is entitled to counsel and to compulsory process for bringing in his witnesses. He is now entitled to a jury trial if the criminal sentence is a potentially serious one. As with other crimes, intent is an element of criminal contempt, and it must be proven before criminal punishment can be inflicted, though intent to violate the court's order is not an issue in a civil contempt proceeding.... The classification of a contempt hearing as a criminal one may also affect the right of appeal or the route that an appeal takes. At least in some criminal contempt cases, the state should be a party to any appeal proceedings. The criminal classification will also invoke the pardoning power of

Classification of contempts is, in many instances, an improbable task. They "are neither wholly civil nor altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.'" *Gompers v. Buck Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911) (citation omitted). It is at once "the proteus of the legal world, assuming an almost infinite diversity of forms," Moskovitz, "Contempt of Injunctions, Civil and Criminal," 43 Col. L.Rev. 780 (1945), and "sui generis—neither civil actions nor prosecutions for offenses, within the ordinary meaning of those terms." *Myers v. United States*, 264 U.S. 95, 103, 44 S.Ct. 272, 273, 68 L.Ed. 577 (1924).[10] Its civil and criminal aspects are "considered but nuances of each other and are often applied interchangeably." Goldfarb, *supra* at 51. *See also* 5 Moore's Federal Practice, ¶ 38.33[1] at 257 (2d ed. 1979).

■ But despite these chameleonlike qualities, the problem of classification is not insurmountable. The "pivotal inquiry" is: "What does the court primarily seek to accomplish by imposing sentence?" *Shillitani v. United States, supra*, 384 U.S. at 370, 86 S.Ct. at 1535; *Douglass v. First National Realty Corp.*, 543 F.2d 894, 898 (D.C. Cir.

1976). If the purpose is either to coerce compliance or compensate for injuries suffered by a private party, the contempt is civil. If the intent is to punish, by either fine or imprisonment, with a view toward vindicating governmental authority, the contempt is criminal. *Id. See also Gompers v. Buck Stove & Range Co., supra*, 221 U.S. at 441–444, 31 S.Ct. at 498–499; *Ager v. Jane C. Stormont Hospital*, 622 F.2d 496 at 500 (10th Cir. 1980).

■ Other facts to be considered include the procedures followed, the parties before the court, and whether or not the contempt arises in or is separate from an original proceeding. *See Moskovitz, supra* at 786–791.[11] As noted above, criminal, but not civil, contempt may invoke the right to trial by jury, pit the public against a defendant, and is not part of a main proceeding. Civil contempt is between private parties and will be ancillary to a main proceeding. *See, e. g., Penfield Co. v. SEC*, 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117 (1947); *Gompers v. Buck Stove & Range Co., supra*, 221 U.S. at 444–445 and 447–448, 31 S.Ct. at 499–500 and 500–501.

■ Application of these criteria indicates the civil rather than criminal nature of this contempt. Sanctions sought against

the state, which of course, would not exist in civil cases.

There are disadvantages for the party charged if his contempt case is classified as a criminal one. Any fine levied is not dischargeable in bankruptcy. Moreover, he may be held in criminal contempt for violating an order that is later reversed since it may be important to vindicate judicial power even when it is erroneously exercised. In at least some cases, this same principle applies when the court lacks jurisdiction of the subject matter, and a criminal contempt sentence may stand even though there was no jurisdiction." Dobbs, "Contempt of Court: A Survey," 56 Cornell L.Rev. 183, 241–243 (1971).

10. "Occasionally courts say that contempt proceedings are neither civil nor criminal, but are sui generis. This is accurate enough if not misunderstood. Such statements do not mean that the classification of contempt cases as civil or criminal is abandoned; rather, they mean only that there are instances in which special

rules must apply to contempt cases. For example, even a criminal contempt case need not be initiated by indictment or information, and a juvenile may be punished for contempt not only in juvenile courts, but in other courts as well. Special problems of this sort aside, the classification of contempt cases as civil or criminal remains the standard approach." Dobbs, "Contempt of Court: A Survey," 56 Corn.L.Rev. 183, 235 (1971).

"Proceedings for contempt of court are sui generis. The label has no value, save as a caveat. It warns us that precedents from other fields of law will not solve the problems in this one, but the term does not itself furnish any solutions." *Moskovitz, supra* at 783.

11. One authority, while questioning the importance of these factors, concludes that they are at least relevant in apprising respondents of the charges against them. *See, e. g.*, Dobbs, "The Contempt Power: A Survey," 56 Cornell L.Rev. 183, 239 (1971).

the respondents are not punitive but remedial, *i. e.*, to compensate debtors for injuries in connection with violation of the stay. The spectre of imprisonment, even in a coercive sense, is not present.

The case was brought and tried under the assumption that only civil contempt was at stake. *See Moskovitz, supra* at 788. The notice of criminal contempt required by Rules 920 and 42 was not given. Neither side challenged the jurisdiction of this Court to determine the cause, consistent with Section 1481. The United States Attorney was not invited to enter an appearance, despite the fact that government property was involved.[12] And there was no bifurcation of the trial for contempt from the Chapter 7 proceeding out of which it grew.

Finally, the fact that debtors sought a contempt citation believing they were denied the statutory relief to which they are entitled under 11 U.S.C. Section 362(a) indicates the civil nature of the contempt. *Cf. Penfield v. SEC, supra,* 330 U.S. at 590–591, 67 S.Ct. at 921–922. All these facts confirm the conclusion that this was a civil, not criminal, contempt.[13]

**12.** The Small Business Administration has a first lien on the restaurant.

**13.** Classification of contempts is confusing, according to Dobbs, because courts categorize the act of contempt rather than the proceeding or the sentence. What is needed, in his view, is an *"operational* definition rather than an abstract one. In other words, by providing in a statute exactly what is to be *done* rather than by describing a theory." With this objective in mind, he outlines the problem and prescribes a cure:

"One can reason that a case is a criminal one and hence that the criminal law protections must be afforded the accused. One might equally well reason that, since criminal law procedural safeguards were *not* afforded, the case must have been a civil one. Or one might reason, not from the procedure but from the sentence meted out, that the case was criminal or civil and that the procedure should be adjusted accordingly.

The fact is that most of this is not only confusing, it is also unnecessary. In each case supposed, a reviewing court could reverse, whatever classification is used, simply because procedure and sentence were not compatible. It is enough to say that a determinate ('criminal') sentence cannot be meted out where criminal-type protections are not afforded in the procedure. It is not necessary to say more.

The process of classification of contempt hearings into civil and criminal cases has probably made matters worse rather than better. The classification process, if it worked at an ideal level, would serve to remind judges, lawyers, and parties to consider the following:

1. There are options in dealing with any contempt found; sanctions may be coercive or they may be non-coercive and punitive.

2. If there is a risk that a punitive, non-coercive sanction may be imposed, the party charged with contempt should know of this in advance.

3. If there is a risk that a punitive, non-coercive sanction may be imposed, the hearing must be conducted largely according to the rules of criminal procedure—contempt must be proved beyond a reasonable doubt, the party charged must have an opportunity to confront accusers, the party cannot be forced to testify against himself, and so on.

4. If the criminal procedures are not used, a determinate sentence, such as imprisonment for a given number of days or a fine of a set amount, is not proper.

. . . .

A statute might, for instance, begin by requiring the trial judge to state whether coercive or non-coercive sanctions or both were possible results of any contempt hearing. This would serve, first, to remind the judge of the options available to him and to warn the party charged exactly what was in jeopardy at the hearing. Second, such a statute might set forth a rule that if non-coercive (punitive) sanctions are possible, criminal procedure must be followed. This would serve to remind all parties, and the trial judge, what procedures are necessarily involved. Third, the statute could set forth the rule that coercive sanctions may be used in any case where they are an announced possibility, and that non-coercive sanctions may be used only where the procedure at the hearing complies with that in other criminal cases. (A modified rule might be necessary for direct contempts.) Once these rules are set out—and they are simple and direct—the statute could serve as a guide to judgment as well as to fairness, and it would certainly serve to avoid the confusions surrounding the present distinction between civil and criminal hearings." Dobbs, "The Contempt Power: A Survey," 56 Cornell L.Rev. 183, 245–247 (1971) (emphasis in original). *See also United States v. United Mine Workers of America,* 330 U.S. 258, 368–376, 67 S.Ct. 677, 733–737, 91 L.Ed. 884 (1947) (J. Rutledge, dissenting opinion) (nature of contempt should be fixed at outset rather than on appeal of a case).

### The Necessity of Notice or Knowledge of the Stay

■ Where injunctions such as the stay are concerned, contempt ordinarily consists of disobedience to an order of the court.[14] The disobedience, in civil contempt, need not be willful. *See, e. g., McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed.. 599 (1949); *In re American Associated Systems, Inc.,* 373 F.Supp. 977, 979 (E.D.Ky.1974) (subjective good faith no defense to civil contempt charge).[15] *But see* Dobbs, Handbook on the Law of Remedies, 104 (1973). Courts generally, however, insist that parties have notice or knowledge of an order which is sufficiently definite and precise to put them on notice of the conduct proscribed before they can be cited for contempt. *See, e. g., Yates v. United States,* 316 F.2d 718, 723 (10th Cir. 1963) (notice or knowledge); *Denver-Greeley Valley Water Users Association v. McNeil,* 131 F.2d 67, 69 (10th Cir. 1942) (notice or actual knowledge).

In this case, the existence of an order and actions by respondents inconsistent with its mandate are not contested.[16] Respondents argue, however, that they had no notice or knowledge of the order, and that its contents were too indefinite and imprecise to give notice of conduct forbidden under the stay.[16a]

### Pro Notice or Knowledge of the Stay

Whether notice or knowledge of the stay is essential to a finding of contempt is a close question. Several reasons support an affirmative answer.

To begin, such a ruling would inhibit use of the contempt power: "a drastic remedy which should be invoked only when the right to its use is clear." *United States v.*

---

14. Most discussions of contempt "begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order incorrect, the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect." *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 590, 42 L.Ed.2d 574 (1974).

A ruling on appeal that the order was unlawful, in most instances, vitiates a civil, but not criminal, contempt. *See, e. g., Hyde Construction Company v. Koehring Company,* 388 F.2d 501, 511 (10th Cir. 1968); *Ager v. Jane C. Stormont Hospital, supra* at 499–500 (reserving the question whether "in those cases in which a district court judge has made an express finding that the action compelled was required in the public interest, a coercive civil contempt ... should survive the subsequent invalidation of the underlying order") (citation omitted); *Dunn v. United States,* 388 F.2d 511, 513 (10th Cir. 1968). *See generally* Dobbs, "Contempt of Court: A Survey," 56 Cornell L.Rev. 183, 216–218 (1971).

15. Collier notes that "inadvertent" violations of the stay are not punishable contempts. 2 Collier on Bankruptcy, ¶ 362.11 at 362–57 (15th ed. 1980). However, he does not define "inadvertent," either alone or as distinct from "willful." Nor does he indicate its meaning in connection with the issue of notice or knowledge of the stay as a predicate for contempt.

16. The order in this case was embodied in the notice of the first meeting of creditors mailed to respondents on October 9. It cautioned creditors that "as a result of the filing of the petition, certain acts and proceedings against the debtor and his property are stayed as provided for in 11 U.S.C. § 362(a)." Specifically, respondents' behavior offends Section 362(a)(6) which proscribes "any act" to collect a prepetition obligation against debtors. The legislative history emphasizes that "any act" encompasses the spectrum of extra-judicial collection activities, including telephone contact and dunning letters. 2 Collier on Bankruptcy, ¶ 362.-04(6) at 362–35—362–35 (15th ed. 1980). *See also In re Heath,* 3 B.R. 351 (Bkrtcy.N.D.Ill. 1980) (denial of university transcript to induce payment of prepetition student loan violates stay); *In re Howren,* 10 B.R. 303, 7 B.C.D. 43 (Bkrtcy.D.Kan.1980) (same); *In re Nelson,* 6 B.R. 248 (Bkrtcy.D.Kan.1980) (bank setoff of debtor's postpetition deposits for prepetition debt violates stay); *In re Stephens,* 2 B.R. 365 (Bkrtcy.N.D.Ohio 1980) (reaffirmation of prepetition debt as condition for obtaining new loan violates stay); *In re Byrne,* 5 B.R. 556 (Bkrtcy.W.D.Pa.1980) (attachment for debt which may be nondischargeable violates stay).

16a. Because of the Court's disposition of the notice knowledge question, it is unnecessary to decide this latter issue here. However, it is discussed in *In re Hubbard,* infra at 278–280.

*Peterson*, 456 F.2d 1135, 1139 (10th Cir. 1972). Naturally, there is a penchant to convict on these facts, lest the Court's ruling be interpreted as license for even more spectacular vandalisms. It is, however, precisely this temptation to stretch conventional judicial processes into unaccustomed molds to achieve a desired result which may lead to abuse of the contempt power. Respondents' misconduct should caution against, not excuse, an unlawful response. Otherwise, in the end, citizens will hold real contempt rather than respect for judicial institutions and the law.[17]

Second, where avoidable, parties should not be held to standards, the infraction of which leads to certain consequences, unless they have knowledge of those standards

and consequences. True, it may be argued that respondents' behaviour would be disapproved by most adult Americans. But it is awareness that conduct will run afoul of a specific decree of court, not awareness of societal norms, contumacious misbehaviour, not merely misbehaviour, which is the foundation of contempt. In this regard, the stay, which comes alive when a petition is filed, differs from orders which are the product of proceedings in which those bound thereby have had previous contact. Safeguards are also available in the event of *ex parte* orders. *See* Rule 65(b), Fed.R. Civ.P.[18] Fairness arguably requires that a party have notice of these facts before he is forced to reckon with judicial power *in extremis*.[19]

---

**17.** *Cf. Fisher v. Pace, supra*, 336 U.S. at 168–169, 69 S.Ct. at 431 ("Lawyers owe a large, but not an obsequious, duty of respect to the court in its presence. But their breach of this obligation in no case justifies correction by an act or acts from the bench intemperate in character, overriding judgment") (J. Rutledge, dissenting opinion).

**18.** *See e. g.*, Dobbs, "Contempt of Court: A Survey," 56 Cornell L.Rev. 183, 259 (1971). The analogy to Rule 65, however, may be carried too far. The automatic stay is not an ordinary injunction. Gaps in coverage may be filled by Section 105. Such a stay "will not be automatic upon the commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions." H.Rep.No.95–595, 95th Cong., 1st Sess., 342 (1977), U.S.Code Cong. & Admin.News 1978, at 6298. By negative implication, Rule 65, with its provision for notice, has no bearing on the automatic stay.

The absence of notice prior to issuance of the stay, however, calls into question its constitutionality. *See, e. g., North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Pearson, "Due Process and the Debtor: The Impact of *Mitchell v. W. T. Grant*, 29 Okl.L.Rev. 277 (1976); Note, "*Sniadach, Fuentes*, and *Mitchell*: A Confusing Trilogy and Utah Prejudgment Remedies," 1974 Utah L.Rev. 536. One court has rejected an argument that *Sniadach* and its progeny require pre-petition notice and hearing before issuance of a stay. *Fidelity Mortgage Investors v. Camelia Builders, Inc.*,

550 F.2d 47, 55 (2d Cir. 1976). *But cf. In re B & B Properties, Ltd.*, 423 F.Supp. 23, 26 (N.D.Ga. 1976) (court "entertains grave concern" respecting constitutionality of stay, but will not rule on writ of mandamus).

Respondents have not attacked the constitutionality of the stay, and it is not at issue. Even if the stay were constitutionally infirm, however, this would probably not immunize them from criminal contempt for a violation of its provisions. *See, e. g., Walker v. City of Birmingham*, 338 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); *United States v. United Mine Workers of America*, 330 U.S. 258, 294–295, 67 S.Ct. 677, 696–697, 91 L.Ed. 884 (1947); footnote 14, *supra*.

**19.** *Cf.* The ABA Standards for Criminal Justice, Function of the Trial Judge, Section 712: "No sanction other than censure should be imposed by the trial judge unless (i) it is clear from the identity of the offender and the character of his acts that disruptive conduct was willfully contemptuous, or (ii) the conduct warranting the sanction was preceded by a clear warning that the conduct is impermissible and that specified sanctions may be imposed for its repetition." The Advisory Committee's Note observes that: "A prior warning is desirable before punishing all but flagrant contempts. A warning may be effective in preventing further disorder and is therefore preferable to sanctions as a first step. It also assures both the court and the public that subsequent misconduct will be willfully contemptuous and deserving of punishment." *But cf. United States v. Abascal*, 509 F.2d 752, 755 (9th Cir. 1975) (contempt under Section 401(1) for refusal to step forward in court when ordered by judge without warning that failure to obey might result in criminal contempt not reversible error); *Douglass v. First National*

Third, absent the sanction of contempt, debtors are not left remediless. They have recourse to ordinary judicial processes to repair their wrong; they are simply denied the extraordinary remedy of contempt.[20]

Finally, the weight of judicial opinion holds that notice or knowledge of the stay is a necessary condition of contempt. The cases considering this problem under the Code have explicitly or implicitly held that notice or knowledge of the stay, not merely awareness of the bankruptcy, is requisite to a finding of contempt. In *In re Raymond Construction Co.*, 6 B.R. 793, CCH Fed. Bank.L.Rep., ¶ 67,720 (Bkrtcy.M.D.Fla.1980) debtor brought suit in state court against a bank. While this action was pending, debtor filed a Chapter 7 proceeding. The bank, unaware of the bankruptcy, moved for sanctions in the state court action because debtor had failed to respond to discovery requests. The trustee argued that this motion violated the stay and was contemptuous. The court was not convinced that the stay had been violated, but even assuming such violation, would not have held the bank in contempt because "there is no evidence before this Court that either the Bank or its attorneys were aware of the pendency of the bankruptcy at the time the Bank filed its Motion for Sanctions." *Id.* 6 B.R. 793, CCH Fed.Bank.L.Rep. at 78,302. Although the court said awareness of the bankruptcy, it probably meant knowledge of the stay, because this was the operative fact in the cases cited in support of its ruling. *Fidelity Mortgage Investors Co. v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976); *In re Hailey*, 621 F.2d 169, CCH Fed.Bank.L.Rep., ¶ 67,585 (5th Cir. 1980).

*In re Abt, Jr.*, 2 B.R. 323, CCH Fed.Bank. L.Rep., ¶ 67,336 (Bkrtcy.E.D.Pa.1980) likewise illustrates these principles. There a creditor, without knowledge of the bankruptcy, repossessed debtor's car. After learning of the stay, creditor refused to return the vehicle. Debtor argued that both the repossession and refusal to return were acts of contempt. The court ruled that the repossession was not contempt because creditor had no knowledge of the stay. It further ruled that the refusal to return was not contempt because this did not violate the stay which, in its view, pro-

*Realty Corp., supra* at 897 n.15 ("If appellant was aware of the *purport* of the order to show cause, it matters not that he had not actually seen the posted copy") (dictum) (emphasis supplied).

**20.** At least one commentator has noted, however, that "requiring resort to such a procedure would eliminate to a substantial degree the advantage the automatic stay was intended to provide over an injunction or restraining order issued by the court pursuant to its statutory injunctive powers and Rule 765." Kennedy, "The Automatic Stay in Bankruptcy," 11 U.Mich.J.L.Ref. 175, 260–261 n. 421 (1978). *See also McComb v. Jacksonville Paper Co., supra*, 336 U.S. at 194, 69 S.Ct. at 501 ("The fact that another suit might be brought to collect the payments is, of course, immaterial. For the court need not sit supinely by waiting for some litigant to take the initiative. Vindication of its authority through enforcement of its decree does not depend on such whimsical or fortuitous circumstances").

An intriguing but untested argument is that debtors, in addition to whatever common law claims, such as trespass and intentional infliction of emotional distress, may be available to them, can imply private civil relief under Section 362(a). The legal environment, at present, however may be inhospitable in this regard.

*See, e. g., Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Securities Investor Protection Corporation v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); *National Railroad Passenger Corp. v. Passengers Association*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). *See generally*, Hazen, "Implied Private Remedies Under Federal Statutes: Neither a Death Knell Nor a Moratorium—Civil Rights, Securities Regulation, and Beyond," 33 Vand.L.Rev. 1333 (1980); Pillai, "Negative Implication: The Demise of Private Rights of Action in the Federal Courts," 47 U.Cinn.L.Rev. 1 (1978); Note, "Implied Causes of Action: A Product of Statutory Construction or the Federal Common Law Power?" 51 U.Colo.L.Rev. 355 (1980); Note, "Implication of Private Actions From Federal Statutes: From *Borak* to *Ash*," 1 J.Corp.L. 371 (1976); Note, "Implied Private Actions Under Federal Statutes—The Emergence of a Conservative Doctrine," 18 Wm. & Mary L.Rev. 429 (1976); Comment, "Private Rights of Action Under *Amtrak* and *Ash*: Some Implications for Implication," 123 U.Pa.L.Rev. 1392 (1975).

hibited but did not require action by creditors. Since there was no order to return the car, there was no basis for holding the creditor in contempt.[21]

Pre-Code decisions confirm the holdings in *Raymond Construction* and *Abt.* The leading authority is *Fidelity Mortgage Investors v. Camelia Builders, Inc., supra.* The debtor, a real estate investment trust, and holder of a deed of trust on condominiums, filed a petition in Chapter XI in New York in January, 1975. Respondents, who were not creditors of debtor, but rival creditors on the condominiums, fearing that the bankruptcy might complicate their lien rights, commenced an action in Mississippi in March, 1975. This lawsuit sought a declaration of the priority of their lien claims over debtor. The Mississippi court required debtor to post security in the amount of $76,000. Debtor also incurred costs in defending this action. Debtor therefore brought contempt proceedings against respondents for violation of the Rule 11–44 stay. Acknowledging that "a person cannot be held in contempt of an order about which the person had no knowledge," citing *Yates v. United States, supra,* the court noted that there was "amply documented knowledge" by respondents of the stay. Indeed, the attorney for respondents had read Rule 11–44 prior to filing the Mississippi action. *Fidelity Mortgage Investors v. Camelia Builders, Inc., supra* at 51.

In *In re Hailey, supra,* debtor filed a petition for voluntary bankruptcy and included respondent, a judgment creditor, on his list of creditors but omitted her street address. She therefore did not receive notice of the proceedings, and executed on her judgment. Meanwhile, she became aware of the bankruptcy but since she "had received no formal notice of the bankruptcy proceedings, she continued to pursue her remedies in state court." *Id.,* 621 F.2d 169, CCH Fed.Bank.L.Rep. at 77,962. She was found in contempt by the referee and, among other things, fined $250. The Fifth Circuit reversed, reasoning that when the stay became effective, respondent "had no knowledge of the proceedings or the order.[22] 'Before contempt may lie the parties must have actual knowledge of the order and the order must be sufficiently specific to be enforceable.'" *Id.,* 621 F.2d 169, CCH Fed. Bank.L.Rep. at 77,964 (citation omitted). As to her actions after she became aware of the bankruptcy, "there was no violation . . . of the bankruptcy court's order sufficient to constitute contempt and thus the entry of the judgment of contempt was error." *Id.* Other pre- and post-Code cases have followed *Fidelity Mortgage* and *Hailey. See, e. g., In re Intaco Puerto Rico, Inc.,* 494 F.2d 94 (1st Cir. 1975);[23] *Ben Hyman &*

---

**21.** *But see In re Eisenberg,* 7 B.R. 683, 688–689 (Bkrtcy.E.D.N.Y.1980) (refusal to withdraw tax lien "was a flagrant act in violation of the automatic stay"); *but cf. In re Walker,* 7 B.R. 216 (Bkrtcy.D.R.I.1980) (delay in releasing attached wages, after notice of bankruptcy, was wrongful and justified imposition of sanctions: the court proceeded on basis of debtor's counterclaim not contempt).

**22.** Use of the disjunctive raises the question whether knowledge of bankruptcy alone may be a predicate for contempt. This possibility, however, is foreclosed by the balance of the opinion.

**23.** In *Intaco,* debtor filed a petition under Chapter X in January, 1971, the trustee sued respondent in April, and respondent counterclaimed in May. Under a threat of contempt, the counterclaim was withdrawn in June. Subsequently when respondent filed a claim in bankruptcy, it was dismissed. The bankruptcy court reasoned that the claim was identical with the counterclaim which, in its view, had been dismissed with prejudice by the district court. On appeal, the question of dismissal with prejudice turned on whether the district court could have properly imposed a contempt sanction for violation of the stay. In ruling on this point, the court said: "We have no doubt that under appropriate circumstances a [stay] against existing creditors can legitimately be enforced by contempt proceedings [citation omitted]. It is also possible that in a proper situation, the price a party could be forced to pay in order to purge himself of such contempt may well be a dismissal of his claim with prejudice. However, dismissal of a claim with prejudice, with all its attendant substantive consequences, is to be regarded as the proper remedy for violation of a [stay] only in the most flagrant cases [citation omitted]. Normally, dismissal of the claim with leave to file in the bankruptcy proceeding will suffice to accomplish the policy objectives underlying the injunction. The record before us indicates that the Creditor was

*Co., Inc. v. Fulton National Bank*, 423 F.Supp. 1006 (N.D.Ga.1966); *Preferred Surfacing, Inc. v. Gwinnett Bank & Trust Co.*, 400 F.Supp. 280 (N.D.Ga.1975) ("The creditors of the debtor are entitled to notice of the filing of the petition and of the entry of the stay;" unclear whether creditor had notice of stay prior to setoff; unclear whether setoff or refusal to return money after notice of stay constituted contempt); *In re Beck Industries, Inc.*, 338 F.Supp. 1369 (S.D.N.Y.1972); *In re Walsh Bros.*, 159 F. 560 (N.D. Iowa 1908); *In re Krinsky*, 112 F. 972 (S.D.N.Y.1902); *In re Pickus*, 8 B.R. 114, 7 B.C.D. 189 (Bkrtcy.D.Conn.1980); *In re Eisenberg*, 7 B.R. 683 (Bkrtcy.E.D.N.Y. 1980); *In re Lewis*, 8 B.R. 132, 7 B.C.D. 105 (Bkrtcy.D. Idaho 1980); *In re Nelson*, 6 B.R. 248 (Bkrtcy.D.Kan.1980); *In re Benjamin*, CCH Fed.Bank.L.Rep., ¶ 67,209 (E.D.Pa. August 14, 1979); *In re Stalnaker*, CCH Fed.Bank.L.Rep., ¶ 67,031 (S.D. Ohio June 23, 1978). *See generally*, 14 Collier on Bankruptcy, ¶ 11–44.02(4) (14th ed. 1976) (Collier reads the *Fidelity Mortgage Investors* case as finding contempt absent knowledge of the stay, which in his view would be error, relying by analogy on *Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966): he would make knowledge of the filing *or* of the stay a condition

*Contra Notice or Knowledge of the Stay*

On the other hand, several reasons support a holding that constructive rather than actual knowledge is enough to satisfy the requirements for contempt, at least when a violation of the stay is involved.

First, insofar as willfulness is synonymous with knowledge, its absence as an element of civil contempt suggests that knowledge of the stay may likewise be unnecessary. *Cf. In re Intaco, supra* at 97 (receipt of notice determines willfulness).

Second, the breadth of Section 105, although untracked, may reach situations of constructive knowledge even though traditional contempt processes may not. Congress intended the stay to shield debtors from precisely this form of "dunning," and Section 105 was designed to plug the interstices in this shield. The stay and Section 105 are ineffectual to the extent that creditors are allowed a "parting shot," born of frustration over their debtor's bankruptcy. True, acts taken in violation of the stay, such as foreclosure sales, are void.[24] This is

completely unaware of the [stay], since no notice of its issuance had been affirmatively communicated to him. And, although the older cases suggest that lack of notice of such an injunction is, *by itself*, insufficient to form a defense to contempt proceedings [citations omitted], it is at least arguable that the many recent Supreme Court pronouncements in the area of procedural due process would compel the conclusion that the older cases are of questionable continued validity. However, that is a matter which we need not presently decide. For, in any case, we believe that, at least where no notice has been given so that the breach of the injunction may not be deemed to have been willful, something more than just the mere filing and prompt withdrawal of a prohibited claim must be shown to justify the contempt-based sanction of dismissal of the claim with prejudice [citation omitted]." *Id.* at 97 (emphasis in original).

**24.** *See, e. g.*, 2 Collier on Bankruptcy, ¶ 362.11 at 362–58 (15th ed. 1980) ("Actions taken in violation of the stay are void and without effect"); *Meyer v. Rowen*, 181 F.2d 715 (10th Cir. 1950) (foreclosure); *In re Wheeler*, 5 B.R. 600 (Bkrtcy.N.D.Ga.1980) (foreclosure); *In re Nelson*, 6 B.R. 248 (Bkrtcy.D.Kan.1980) (bank setoff); *In re Murray*, 5 B.R. 732 (Bkrtcy.D.Md. 1980) (foreclosure); *In re Seafarer Fiberglass Yachts, Inc.*, 1 B.R. 358 (Bkrtcy.E.D.N.Y.1979) (judgment on personal injury claim arising after petition violates stay and is void). The court, however, given its power to grant relief under 11 U.S.C. Section 362(d) by "annulling" the stay, "is not bound to treat acts and proceedings that occur in violation of the automatic stay as nullities." Kennedy, "The Automatic Stay in Bankruptcy," 11 U.Mich.J.L.Ref. 175, 258 (1978).

Insofar as creditors use judicial means to enforce rights against property, their postpetition acts may be void because 28 U.S.C. Section 1471(e) vests exclusive jurisdiction over property of the debtor in the bankruptcy court. *Cf. Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940). Section 1471(e), however, is not without imperfections. First, it speaks in terms of property of the debtor rather than property of the estate, creating a potential difficulty in coverage. Second, it lodges jurisdiction in the court where the petition is

of contempt); Dobbs, "The Contempt Power: A Survey," 56 Cornell L.Rev. 183, 251–252, 257–261 (1971).

no comfort, however, and will not compensate debtors such as these who have the integrity of their persons and property violated.

Third, contempt is available as a remedy in situations where an order, and therefore notice or knowledge of an order, are not present. Contempt has been defined broadly to encompass any act "in disregard of the authority of the court." *In re MacKnight*, 11 Mont. 126, 27 P. 336, 338 (1891) cited in Note, "Civil and Criminal Contempt in the Federal Courts," 57 Yale L.J. 83, 85 (1947). The Judiciary Act of 1789 authorized punishment of "all contempts of authority." 1 Stat. 83 (1789). Similarly, its successor statutes, including Section 401 and Section 41(a), define as contempts misbehaviour unrelated to any order. Likewise, Rule 37(d), Fed.R.Civ.P., made applicable in bankruptcy by Rule 737, Fed.R.Bankr.P., allows the imposition of sanctions, notwithstanding the absence of an order. These sanctions, according to several authorities, are analogous to contempt sanctions. *See*, e. g., Dobbs, Handbook on the Law of Remedies, *supra* at 100–101; Note, "Civil and Criminal Contempt in the Federal Courts," *supra* at 100.

The fact that misbehaviour rather than disobedience to an order is the predicate for contempt should make no difference in terms of awarding compensation to a private party. *See*, e. g., Montgomery, "Fines for Contempt as Indemnity to a Party to an Action," 16 Minn.L.Rev. 791 (1932). And courts have stretched the notion of disobe-

dience, through the fiction of an implied order, to achieve this result where there is interference with property *in custodia legis. See*, e. g., *Clay v. Waters*, 178 F. 385, 394 (8th Cir. 1910); *Lineker v. Dillon*, 275 F. 460, 470 (N.D.Cal.1921). *Cf. Lamb v. Cramer*, 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715 (1932). Indeed, it may be this rationale which points to the petition as a "caveat to the world," *Mueller v. Nugent*, 184 U.S. 1, 14, 22 S.Ct. 269, 274, 46 L.Ed. 405 (1902), and as constructive notice that creditors meddle with property of the estate at their peril. *See* e. g., *Converse v. Highway Const. Co. of Ohio*, 107 F.2d 127, 129–130 (6th Cir. 1939); *In re Quick Charge, Inc.*, 69 F.Supp. 961, 969–970 (W.D.Okl.1947); *In re Cleveland & Sandusky Brewing Co.*, 11 F.Supp. 198, 205 (N.D.Ohio 1935). *Cf. Jones v. Securities & Exchange Commission*, 298 U.S. 1, 15–18, 56 S.Ct. 654, 657–659, 80 L.Ed. 1015 (1936) ("The conclusion to be drawn from all the cases is that after defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided"). *But cf. Morgan v. United States*, 95 F.2d 830 (8th Cir. 1912) (refusing to extend doctrine of *Clay v. Waters*: respondents' "offense was against the peace and dignity of the government rather than disobedience to the particular injunction and command of the order of adjudication in bankruptcy").[25]

filed rather than where the case is pending. This phraseology may produce awkward results where, for instance, a main Chapter 11 proceeding is filed in one district and a relief from stay civil proceeding is brought in another. *See* Kennedy, "The Bankruptcy Court Under the New Bankruptcy Law: Its Structure and Jurisdiction," 55 Am.Bank.L.J. 63, 87–88 (1981). Assuming relief from the stay were granted, would such an order be subject to collateral attack for want of jurisdiction; would the order be void, leaving the stay in effect and violators vulnerable to a charge of contempt? Such hypotheticals may be a law professor's delight, but they are nevertheless real possibilities. *Compare In re American Companies, Inc.*, 6 B.R. 251, 6 B.C.D. 1077

(Bkrtcy.D.Colo.1980) with *In re American Companies, Inc.*, 8 B.R. 384, 7 B.C.D. 127 (Bkrtcy.D.Kan.1981). Congress sought to remedy these defects, however, in the Technical Amendments Bill. H.Rep.No.96–1195, 96th Cong., 2d Sess., 156 (1980).

**25.** The curtailment of the contempt power in recent years has occurred in that category of contempts dealing with misbehaviour in general rather than disobedience to an order. *Compare*, e. g., *Nye v. United States*, *supra*, with *Green v. United States*, 356 U.S. 165, 171–172, 78 S.Ct. 632, 636–637, 2 L.Ed.2d 672 (1958). This is because the order, its terms, and knowledge of the same are already significant constraints on the contempt power. On the other hand, it should be emphasized that *Nye*, its

The stay is designed "to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts. The stay insures that the debtor's affairs will be centralized, initially in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another." *Fidelity Mortgage Investors v. Camelia Builders, Inc., supra* at 55. Implementation of this policy requires a line to be drawn, a reference point which may not accommodate all parties in interest, but from which rights can be safeguarded and measured as to the universe of creditors. It is impractical to expect a debtor to achieve detente with each creditor. If this were possible, he may have composed his obligations outside bankruptcy. It is the impasse and breakdown in his credit relationships which has brought him to this court. Once here, and once knowledge of the bankruptcy is communicated to creditors, directly or indirectly, the burden is more appropriately placed on them to discover the parameters of permissible action against the debtor. This is true not only because a unified forum, with investigative machinery, including a trustee, creditor committees, and the court, are at their disposal for this purpose, but also because they have a greater capacity, in practical terms, to discover than the debtor has to inform.

In short, a ruling that "no person can be held in contempt for violating the stay unless entered by a court after notice and a hearing," would "aggravate existing difficulties of protecting debtors' estates from dispersion and depredation by aggressive claimants. It is not and ought not to be the law that any creditor or other person can bring any action and do any legal act to enforce his claim until he has been restrained by a court order issued after notice and hearing. The automatic stays seek to preserve the status quo, and the equity receivership cases contain numerous instances of the power of the court to protect its custody of the debtor's property from interference by any person, irrespective of the basis for his claim. To require prior notice and hearing as a condition to the enforceability of a stay of proceedings against a debtor or of an act to enforce a lien against his property would give the aggressive creditor an advantage incompatible with the objectives and fundamental assumptions of a rational bankruptcy system." Kennedy, "The Automatic Stay in Bankruptcy," 11 U.Mich.J.L.Ref. 175, 261 (1978).

 Given these competing considerations, the question whether respondents had notice or knowledge of the stay sufficient to hold them in contempt looms large. They deny receipt of the notice sent on October 9. The only evidence impeaching this denial is the facts that the notice was mailed to debtors on the same date, Carol Reed's testimony that she received it on October 11, and her observation that mail routed from Provo ordinarily takes one-half day to reach Pleasant Grove where debtors and respondents reside. Set back to back, these facts may well suggest a stalemate.[26]

offspring, and their restrictive reading of some parts of Section 401 may pertain exclusively to the summary trial of criminal and not civil contempt. See footnote 6, *supra*.

**26.** Although the court does not credit the denial of respondents, it cannot find that they received notice of the stay, since this as well as other elements of civil contempt must be shown by clear and convincing evidence. *See, e. g., Norman Bridge Drug Company v. Banner,* 529 F.2d 822, 830 (5th Cir. 1976); *Converse v. Highway Const. Co. of Ohio, supra* at 132; *Singer Manufacturing Company v. Sun Vacuum Stores, Inc.,* 192 F.Supp. 738, 741 (D.N.J. 1961); Cohan & Hayes, *supra* at 11 ("Civil contempt must be proved by clear and convincing evidence, not the 'preponderance of the evidence' standard generally applied to civil wrongs"); *Moskovitz, supra* at 818–819 ("For a civil contempt, however, the proof need not be beyond a reasonable doubt, although it should be 'clear and convincing' "); Note, "The Coercive Function of Civil Contempt," 33 U.Chi.L. Rev. 120, 122 and 126 (1965) ("The burden of proof lies somewhere between the criminal 'reasonable doubt' and the civil 'fair preponderance' burden; it is heavy, but less than that required for criminal conviction" although this rule may be questioned: "It even seems peculiar that a heavier burden of proof must be carried against the civil contemnor than

Knowledge of the stay, however, may be inferred from knowledge of the petition and circumstances surrounding the bankruptcy.

It is undisputed that respondents knew of the bankruptcy. Debtors twice communicated their intent to file a petition if respondents would not take back the restaurant. Respondents met with their counsel respecting these matters. After the restaurant closed, Holly Broadhead posted a note on its door: "Closed Bob Reed is taking out Bankrupsy [sic] Holly." (Exh. 14).

Moreover, respondents' awareness that bankruptcy would place debtors beyond the reach of ordinary collection processes is implicit in statements made during trial. Asked, "when you hear the word bankruptcy what does that mean to you," Holly Broadhead answered, "It means that I'm probably going to lose my hard work that I put into this for ten years" (T. 38, ls. 6–9). A similar colloquy occurred with Betty Quinn:

Q. When you think of the word bankruptcy what do you think of?

A. What do I think of? I've lost out on everything I've worked hard for over the years.

Q. If you filed bankruptcy would you feel that you have a right or your creditors have a right to go to your premises and dump food and debris on your lot?

A. I think the creditors have the right to know what's going on so that they wouldn't have to do that, that they know what's going on so that they can take action in a different manner.

This answer by evasion, as well as the facts noted above, suggests that respondents knew that bankruptcy insulated debtors from lawful collection methods and, by logical extension, from tortious harassment. At least respondents knew that the restaurant, once property of the debtors, had become property of the estate, administered by a trustee. They knew that, as such, it enjoyed custodial status with the court. Hence, the debtors were replaced by a trustee; the doors were locked; a key was obtained only by special permission and with access limited to cleaning out spoiled food. Knowing that bankruptcy kept them at bay in terms of the restaurant in which they held a lien as creditors, they must have known that this protective umbrella covered the debtors themselves.

■ On these facts, weighing the possibility that notice of the stay arrived before October 12, the awareness of the bankruptcy and the veil it casts between creditor and debtor, as well as contact with the trustee who held the restaurant *in custodia legis*, concrete knowledge of the stay as a requirement for contempt does not strike an appropriate balance between the rationale for notice and the remedial purpose of the stay. In short, where there are special facts such as these, showing not only a knowledge of the bankruptcy but also its implications in terms of protection for the debtor, a creditor will be in contempt of the stay if he abridges the protection to which he reasonably should know the debtor is entitled, even if he has no positive knowledge of the stay.[27] *See In re Edwards*, 5 B.R. 663, 665 (Bkrtcy.M.D.Ala.1980) ("It is not necessary that a creditor have formal notice of the commencement or the pendency of a bankruptcy proceeding where it has sufficient facts which would cause a reasonably prudent person to make further inquiry"); *In re MacDonald*, 6 B.R. 23 (Bkrtcy.N.D.Ohio 1980) (accord).

The line of fracture between enlarging the contempt power and enforcing the stay is thin. Sound policy, however, dictates that it be drawn in favor of making the stay meaningful. To hold otherwise may

---

against the ordinary civil defendant"). Collier, however, notes that once it is proved that an order has been made, creditors have knowledge of it, and have disobeyed, a prima facie case exists, and the burden of explaining the disobedience shifts to creditors. 2A Collier on Bankruptcy, ¶ 41.03 at 1590 n. 3a (14th ed. 1978).

27. The Court is not required to decide whether a violation of the stay in connection with knowledge of the bankruptcy alone may constitute contempt.

"give tremendous impetus to a program of experimentation with disobedience of the law" or "prevent accountability for persistent contumacy." It may be noted that "respondents are not unwitting victims of the law. Having been caught in its toils, they were endeavoring to extricate themselves. They knew full well the risk of crossing the forbidden line. Accordingly where as here the aim is remedial and not punitive, there can be no complaint that the burden of any uncertainty in the decree [or notice] is on [their] shoulders." *McComb v. Jacksonville Paper Co., supra*, 336 U.S. at 192 and 193, 69 S.Ct. at 500.[28]

### Appropriate Sanctions

Actual loss is the measure of compensatory fines for civil contempt. *See, e. g., United States v. United Mine Workers of America*, 330 U.S. 258, 303–304, 67 S.Ct. 677, 701–702, 91 L.Ed. 884 (1947). And absent an evidentiary basis for determining not only the amount but also the reasonableness of such loss, any sum awarded may be deemed speculative, arbitrary, and therefore reversible. *Allied Materials Corporation v. Superior Products Company, Inc.*, 620 F.2d 224 at 227 (10th Cir. 1980). *See also Atlas Corporation v. DeVilliers*, 447 F.2d 799, 803 (10th Cir. 1971). Attorneys fees may be part of this equation. *Allied Materials Corporation v. Superior Products Company, Inc., supra* at 227.

While this, however, may be the general rule, the contempt power also allows creativity in the fashioning of remedies. Indeed, the *McComb* opinion notes: "We are dealing here with the power of a court to grant the relief that is necessary to effect compliance with its decree. The measure of the court's power in civil contempt proceedings is determined by the requirement of full remedial relief." *McComb v. Jacksonville Paper Co., supra*, 336 U.S. at 193, 69 S.Ct. at 500.

Thus, under certain circumstances, the claims of creditors guilty of contempt may be expunged, *see, e. g., In re Intaco Puerto Rico, Inc., supra* at 97, or subordinated. *Cf.* 11 U.S.C. Section 510(c); 3 Collier on Bankruptcy, ¶ 510.01 *et seq.* (15th ed. 1980); Miller & Cook, A Practical Guide to the Bankruptcy Reform Act, 272–273 (1979); Herzog and Zweibel, "The Equitable Subordination of Claims in Bankruptcy," 15 Vand.L.Rev. 83 (1961).

*In terrorem* fines, used as a deterrent, where there is a proclivity for future misconduct, may also be appropriate. *See, e. g., United States v. United Mine Workers of America, supra*, 330 U.S. at 304–307, 67 S.Ct. at 701–703; *Sunbeam Corporation v. Golden Rule Appliance Co.*, 252 F.2d 467, 472 (2d Cir. 1958); *Singer Manufacturing Company v. Sun Vacuum Stores, Inc.*, 192 F.Supp. 738, 743 (D.N.J.1961). *But see* Dobbs, "The Contempt Power: A Survey," *supra* at 275–276 (the *in terrorem* fine "is coercive when threatened but not when applied" and hence presents special problems); *Winner Corporation v. H. A. Caesar & Co., Inc.*, 511 F.2d 1010, 1015 (6th Cir. 1975) (coercive contempt fines appropriate only when government is complainant).

Punitive damages are problematical because, if awarded, they may transform a civil into a criminal contempt. It could be argued that they are assessed in other civil cases involving tortious conduct. *See, e. g.,*

---

28. A final question which could have been but was not addressed by debtors is whether persons who are not parties to the stay but who have assisted in its violation may be held in contempt. There is evidence that respondents' relatives or children may have participated in the siege on debtors' home. They were not, however, included in the order to show cause. *See generally, In re Baum*, 606 F.2d 592, 593 (5th Cir. 1979); McClintock, Handbook of the Principles of Equity, 37 (1948) ("Any person who knowingly aids or abets the violation of an order or decree may be punished for criminal contempt; only a party to an injunction may be held for a civil contempt"); Cohan & Hayes, *supra* at 12 ("An injunction is binding not only upon the parties to the action, their officers, agents, servants, employees and attorneys, it is also binding upon persons acting in concert or in participation with those who receive actual notice of the order by personal service or otherwise"); Dobbs, "Contempt of Court: A Survey," *supra* at 249–261; Rendlemen, "Beyond Contempt: Obligors to Injunctions," 53 Tex.L. Rev. 873 (1975).

*In re Walker*, 7 B.R. 216, 222 (Bkrtcy.D.R.I. 1980). The *in terrorem* fine, approved in *United Mine Workers*, although coercive, like punitive damages, serves a deterrent purpose. Indeed, sanctions under Rule 37(d), such as striking pleadings or entering default judgment, while civil in name, may be punishing in effect. Dobbs, Handbook on the Law of Remedies, *supra* at 100–101; Dobbs, "The Contempt Power: A Survey," *supra* at 278–282. In other words, it may be questioned whether punitive damages, if paid to a party rather than to the government, could be remedial in the sense of being a deterrent. *But see* 5 Moore's Federal Practice, *supra* ¶ 38.33[1] at 257 (civil contempt is not intended as deterrent to offenses against public). The court is reluctant, however, to assess punitive damages, even on facts such as these which warrant their award, because it may create a criminal contempt and offend the limitations of Section 1481.

Much time was consumed at the hearing in an attempt to show the worth of the food and packaging destroyed. Estimates ranged, assuming the usability of the food, from $50 to $200 to $500. Cost of the food, however, may be irrelevant, since it involved a loss to the estate and not debtors who are asking for relief. The court is more impressed with the less tangible injuries and loss occasioned by trespass on the physical and emotional integrity of the debtors and their home. Carol Reed testified: "I felt very shocked, very humiliated. I felt that we were being totally invaded, our personal lives were being invaded or something, I can't explain how I felt. I personally spent the whole day crying, it was very upsetting to me." (T. at 10 ls. 24–25 and 11 ls. 1–2.) The value of the food pales in comparison with this invasion of privacy. The fact that the food may have been in part spoiled and the vandalism cheap only underscores the personal offense. Bankruptcy is a crucible: these proceedings remind debtors often enough of their economic misfortune. Extra-judicial reminders, although some creditors would make them part of the ritual of atonement, are unwelcome.

Under these circumstances, loss to the debtors, although difficult to measure, was no less than $500. This figure includes debtors' labor in cleaning their yard, as well as mental suffering. Evidence of attorneys fees was not presented. However, an "award for counsel fees, and other expenses of suit, need not be based on evidence of actual cost. This failure to require evidence seems proper since the courts should be expert in assessing the value of legal services and the costs of bringing suit. The award should be limited to what is reasonable, actual expenditure not being the test, an appropriate rule inasmuch as plaintiff controls the amount of such expenses." Moskovitz, *supra* at 807. *See also Sunbeam Corporation v. Golden Rule Appliance Co., supra* at 470 ("Such expenses [counsel fees] may be estimated and appraised by the court without proof of exact expenditure"). *But see In re Lewis, supra,* 8 B.R. 132, 7 B.C.D. at 109 (no award of attorneys fees in contempt proceeding without "contractual or statutory right"). A reasonable attorneys fee in connection with this case is $300. The $500 in damages and $300 in costs are payable by respondents, jointly and severally, to debtors and their counsel within 30 days from the date of this opinion. The court will also entertain a recommendation from the trustee, as a disinterested party, whether respondents' lien rights in the restaurant, if there is sufficient equity to give them value, should be subordinated to the claims of unsecured creditors.

## THE HUBBARD CASE

The debtor, Richard Earl Hubbard, was hired as general manager of respondent, Uintah Basin Telephone Association, in January, 1979. During his tenure as an employee, he incurred long distance telephone charges in the amount of $975. Larry Ross, chairman of the board of directors of respondent, discussed this obligation with debtor in the fall of 1979. At that time, debtor indicated that "it would probably be the best course . . . to take out bankruptcy." (T. 8, ls. 19–20.) Ross responded:

A. Living in a small community, I strongly suggested he pay his bill. (T. 6, ls. 8–9.)

. . . .

A. The thing I was concerned about with Mr. Hubbard, as I mentioned a few minutes ago, our company is located in a small town where everyone knows everyone else. I told him that it would not be in the interest of the telephone company for him to take out bankruptcy. Probably if he did that, it would create problems for the company and Mr. Hubbard himself.

Q. What problems could you see that it would create for the telephone company or for him himself?

A. I suppose that it may reflect something upon the telephone company, the board of directors, and why would we hire a man that if he couldn't take care of his own business, how's he going to take care of the telephone business? In a small community, there is a lot of discussion about personalities and people and everyone knows everyone. That was a great concern to me.

Q. Was that part of the conversation witnessed by Mr. Hubbard?

A. That's right. It's not your right to take out—I can't look upon that with favor at all. (T. 16, ls. 20–25; 17, ls. 1–13.)

Ross had one other discussion with debtor, and with Dennis Draney, counsel for respondent, about the possibility of debtor filing bankruptcy, and specifically about procedures under Chapter 13. Blaine Ferguson, counsel for debtor, called Draney on January 14, 1980 and informed him that debtor would file a petition under Chapter 13 in the near future. The petition was filed on January 22. Notice of the automatic stay was mailed to all creditors, including respondent, on January 25. The notice mailed to respondent may have been received by debtor as general manager. Notice, however, was also mailed to Draney. A plan was confirmed February 11. The order of confirmation was entered February 28. Ruth Allen, the office supervisor who handles bankruptcy claims for respondent, testified that debtor notified her of the Chapter 13 proceedings in March or April and arranged for payroll deductions to reduce his debt. One such deduction in the amount of $50 was made.

On June 19, Ross approached debtor and demanded payment of the telephone bill. There was an innuendo that unless the obligation was satisfied, loss of employment would follow. Under this duress, debtor made partial payment in the amount of $556. Shortly thereafter, respondent, through its board of directors, ordered and received the resignation of debtor as general manager.

These proceedings were initiated by an "Objection to Claim and Motion for Order to Show Cause" made by the standing Chapter 13 trustee on August 26. It was supported by the affidavit of debtor and a memorandum of points and authorities. An order to show cause was issued on August 27. A hearing was held October 28. The court, at that time, ruled from the bench. This memorandum opinion formalizes that ruling.

*Civil or Criminal Contempt*

█ This case, for the reasons enumerated above, involves civil rather than criminal contempt. The participation of the trustee does not alter this result. True, she is appointed by and is an arm of the court, and her presence therefore may suggest a prosecutorial mode. *See, e. g., Moskovitz, supra* at 786–787. She is, however, a standing trustee, and was not appointed to bring this contempt action. It was brought on her initiative, not by invitation of the court. It was prompted by her duty, legislatively imposed, to protect creditors and to assist the debtor in performing the plan, not to vindicate the authority of the court. Counsel for debtor was present at the hearing and, until called as a witness, acted as co-counsel with the trustee. All of these circumstances indicate the private rather than public nature of the relief sought. Moreover, even if the trustee's role complicates the nature of the proceedings, it is only one

factor of many; the balance support the classification of civil contempt.

### Notice or Knowledge of the Stay

█ Respondent had not only knowledge of the bankruptcy but also notice of the stay. This is shown by the telephone call from Ferguson to Draney, the mailing of the order to Draney, and the notification of Allen. These facts, standing alone, are sufficient to demonstrate notice. *Cf. In re MCA, Inc.*, 425 F.Supp. 457, 459 (S.D.N.Y. 1977). *But see Green v. United States*, 356 U.S. 165, 221–223, 78 S.Ct. 632, 662–664, 2 L.Ed.2d 672 (1958) (J. Brennan, dissenting opinion). They are, of course, highlighted by Ross's awareness of the impending bankruptcy through his conversations with debtor and Draney, and by his testimony concerning provincial intelligence networks.

### Adequacy of the Order

In *Reed*, the conclusion that constructive knowledge of the stay was enough to support civil contempt rendered moot any discussion of the order. Where positive knowledge of the stay is unnecessary, the content of the order is superfluous. Here, however, the finding of knowledge of the stay rests in part on mailing of the order to Draney, and therefore its content is placed at issue.

The authorities usually require that the order be definite and precise; it must be an "operative command capable of 'enforcement,'" stating in "'specific . . . terms' the acts that it required or prohibited. The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. . . The most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension." *Longshoremen v. Marine Trade Ass'n*, 389 U.S. 64, 74 and 76, 88 S.Ct. 201, 206 and 208, 19 L.Ed.2d 236 (1967). Put differently, "a person will not be held in contempt of an order unless the order has given him fair warning that his acts were forbidden. . . 'The longstanding, salutary rule in contempt cases is that ambiguities

and omissions in orders redound to the benefit of the person charged with contempt.'" *United States v. Christie Industries, Inc.*, 465 F.2d 1002, 1006 (3d Cir. 1972) (citation omitted). *See also Williams v. United States*, 402 F.2d 47, 48 (10th Cir. 1967).

█ Hence, merely precatory remarks by a judge cannot be translated into "orders" upon which contempt may be found. *In re Stewart*, 571 F.2d 958, 966 (5th Cir. 1978); *In re Joyce*, 506 F.2d 373, 378–379 (5th Cir. 1975); *In re LaMarre*, 494 F.2d 753, 758–759 (6th Cir. 1974). Where an order proscribing interference with property does not include driver-salesman routes in the description of such property, and where the status of such routes is unclear, no contempt would lie for servicing those routes. *In re Rubin*, 378 F.2d 104, 108–109 (3d Cir. 1967). A bank which set off amounts owing from a debtor which had filed under Chapter XI would not be held in contempt where the Rule 11–44 stay did not mention set offs and its application to set offs involved a novel construction of the rule. *Ben Hyman & Co., Inc. v. Fulton National Bank, supra*, at 1011. *See also Matter of Sixth & Wisconsin Tower, Inc.*, 108 F.2d 538 (7th Cir. 1939); *Morgan v. United States, supra; In re Probst*, 205 F. 512 (2d Cir. 1908). *Compare Clay v. Waters, supra*.

█ Judged by these standards, the order in this case, from one view, may be deficient. It cautions creditors that "as a result of the filing of the petition, certain acts and proceedings against the Debtor and his property are stayed as provided for in 11 U.S.C. Section 362(a)." Indeed, it has been argued that "ambiguity lurks in generality and may thus become an instrument of severity. Behind the vague inclusiveness of an injunction . . . is the hazard of retrospective interpretation as a basis of punishment through contempt proceedings," and that a statute, such as Section 362(a), "cannot properly be made the basis of contempt proceedings merely by incorporating a reference to its broad terms into a court order." *McComb v. Jacksonville Paper Co., supra*, 336 U.S. at 197 and 195–196, 69 S.Ct.

at 502 and 501–502 (JJ. Frankfurter and Jackson, dissenting opinion). *See also Munitions Carriers Conference v. American Farm Lines*, 440 F.2d 944, 947 (10th Cir. 1971) (Rule 65 "requires all injunctive orders to be specific in terms and to 'describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained' ").

These concerns, however, are not compelling. Several authorities have held that the bankruptcy rules constitute orders within the meaning of Section 41(a), the violation of which may lead to contempt. *See, e. g., Fidelity Mortgage Investors v. Camelia Builders, Inc., supra* at 52–53; *In re Eisenberg, supra* at 691–692; *In re Smith*, 1 B.R. 334, 336 (Bkrtcy.D.Colo.1979); *In re Kings Row Fireplace Shops of Rivergate, Inc.*, 1 B.R. 720, 721 (Bkrtcy.M.D.Tenn.1979). *But In re Brown*, 454 F.2d 999, 1006 and n. 33 (D.C.Cir.1971) (questions whether standing rule of court may be rule within meaning of section 401(3): "Use of the criminal contempt power to vindicate violations of court rules of practice arguably would expand that power beyond congressional contemplation and in given cases would produce monstrous results"). *Compare Seymour v. United States*, 373 F.2d 629 (5th Cir. 1967). By analogy, the statutory proscription found in Section 362(a) may be a predicate for contempt, independent of any order of the court. The order, which incorporates Section 362(a) by reference, is no less definite. Indeed, it is modeled after Interim Bankruptcy Form No. 13 promulgated by The United States Supreme Court's Advisory Committee on Bankruptcy Rules to Draft New Rules of Bankruptcy Procedure.

Finally, notwithstanding the call for precise orders, an order must be construed "in light of the circumstances surrounding its entry: *the relief sought by the moving party*, the evidence produced at the hearing on the injunction, *and the mischief that the injunction seeks to prevent.*" *United States v. Christie Industries, Inc., supra* at 1007 (emphasis supplied). *See also, United States v. Greyhound Corporation*, 508 F.2d 529, 532 (7th Cir. 1974) ("The court should consider the entire background behind the order—*including the conduct that the order was meant to enjoin or secure, the interests that it was trying to protect, the manner in which it was trying to protect them*, and any past violations and warnings—in determining whether the order is sufficiently specific and in determining whether the defendant knew or should have known that his conduct was wrongful") (emphasis supplied). As noted above, the stay is peculiar to bankruptcy. Its remedial purpose and the fear of easy evasion support the sufficiency of the order in this case. Once alerted to the bankruptcy, respondent should have inquired concerning the effect of the stay. Otherwise, it acted at its peril. *McComb v. Jacksonville Paper Co., supra; In re MacDonald, supra.*

## Violation of the Stay

Having determined the validity of the order, violation of the stay is clear. Initially debtor contended that his discharge as general manager was due to nonpayment of the bill and that this violated the stay. *Compare, e. g., In re Terry*, 7 B.R. 880, 7 B.C.D. 21 (Bkrtcy.E.D.Va.1980); *In re Gilece, Jr.*, 1 B.R. 762 (Bkrtcy.E.D.Pa. 1980). This contention, however, was waived at trial and debtor relied on respondent's postpetition demands for payment of the bill, which are undisputed, as violations of the stay.

## Appropriate Sanctions

Having established a violation of the stay, debtor is entitled to sanctions. Actual damages would be the amount paid by debtor to respondent, or $606. This amount must be refunded to debtor. Likewise, attorneys fees in the amount of $250 should be paid to the trustee for bringing this action. The claim of respondent is also disallowed. From the bench, the court assessed a $500 fine against respondent. On reflection, this sanction is inappropriate; the fine is therefore withdrawn. The balance owing shall be remitted to debtor and the trustee within 10 days from the date of this opinion.